743 A.2d 405

### STATE SYSTEM OF HIGHER EDUCATION, (CHEYNEY UNIVERSITY), Appellee,

v.

### STATE COLLEGE UNIVERSITY PROFESSIONAL ASSOCIATION (PSEA–NEA), Appellant.

Supreme Court of Pennsylvania.

Argued Nov. 17, 1998.

Decided Dec. 22, 1999.

Thomas W. Scott, for State College Univ. Proffessional Association.

Peter J. Ennis, State System of Higher Education.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN AND SAYLOR, JJ.

## OPINION

CAPPY, Justice.

The court granted allocatur to determine whether the Commonwealth Court erred in vacating a labor arbitrator's award. Because this court has stated differing iterations of the appropriate standard of review, in undertaking this inquiry, we are required to reconsider the proper role of an appellate court when reviewing a labor arbitration award under the Pennsylvania Public Employe Relations Act (Act 195).[1] For the reasons stated below, we reverse the decision of the Commonwealth Court as violative of the appropriate standard of review and reinstate the award of the arbitrator.

The facts of the case are not in dispute. Cheyney University of the State System of Higher Education (the University) hired Frank Mitchell for employment in its Admissions Office on March 28, 1994. Mr. Mitchell was hired as a State University Administrator 2, Admissions Counselor/Recruiter, and was responsible for the University's "outreach activities." Pursuant to the collective bargaining agreement between the University and the State College University Professional Association (the Union), newly hired employees are considered probationary employees during their first twelve months of employment.

On November 8, 1994, while still a probationary employee, the Baltimore Harbor Tunnel Police arrested Mr. Mitchell for speeding when returning from a recruiting trip to Washington D.C. When Mitchell was not able to produce a valid driver's license, the police impounded his state-owned car. Mr. Mitchell remained with the vehicle while at the police barracks.

The next day, Mr. Mitchell and the towing service each independently notified the University of the events of the

1. 43 P.S. § 1101.101 *et seq.*

prior evening. Mr. Mitchell attempted to contact his superior, Sharon L. Cannon, Director of Admissions. Unable to reach Ms. Cannon directly, Mr. Mitchell left a message that he was unable to attend work for personal reasons. Mr. Mitchell did speak with Steve Hilton of the University Motor Pool and informed him that he planned to call a friend to come to the police barracks to drive the vehicle back to the University. However, the University's Director of Facilities became aware of the situation and dispatched two University employees to retrieve the automobile.

That same day, without any further confirmation or verification of the allegations and before hearing Mr. Mitchell's version of the events, Ms. Cannon recommended to the Vice President of Student Affairs that Mr. Mitchell's employment with the University be terminated. When he returned to his office, Mr. Mitchell was informed of his superior's recommendation and he was reassigned to administrative duties. Although Mr. Mitchell informed the University that he had recently moved from state to state causing confusion with respect to the status of his license, the University did not consider this information in taking action against Mr. Mitchell.

On January 19, 1995, Mr. Mitchell was terminated, effective in 90 days, i.e., April 21, 1995, pursuant to the collective bargaining agreement.

On February 22, 1995, the Union filed a grievance on behalf of Mr. Mitchell challenging his discharge. The parties were unable to resolve the grievance at the preliminary steps of the grievance procedure, and thus, the grievance proceeded to arbitration before Edward A. Pereles, Esq.

Before Arbitrator Pereles, the University argued that because Mr. Mitchell was a probationary employee at the time of his termination, the dispute was not arbitrable and the arbitrator had no jurisdiction. Article 13, Section 2.C of the collective bargaining agreement provided for a bifurcated hearing when the jurisdiction of an arbitrator is challenged. Thus, the first day of hearing with respect to the jurisdiction of the arbitrator was heard on May 15, 1996.

This initial phase of the arbitration presented a question of contract interpretation. The parties each offered differing interpretations of the contract language found in Article 14, Section 3, which is entitled "Discharge, Demotion, Suspension and Discipline":

*During a professional employees [sic] initial twelve (12) months of employment, the provisions of this Article shall not apply.* If at any point during a professional employee's initial probationary period, the President or their [sic] designee(s) determine that the professional employee will not be retained, the professional employee will be given 90 days notice prior to termination, which may include paid or unpaid periods of time. *The parties hereto recognize that for some serious offenses, progressive discipline is inappropriate and that immediate removal may be warranted and such 90 days [sic] notice period referred to in this section shall not be applicable.*

Collective Bargaining Agreement Article 14, Section 3, p. 7 (emphasis supplied).

The University focused on the first sentence of Article 14, Section 3. The University argued that the language completely prohibited a probationary employee from filing any grievance to challenge his termination. University witnesses offered that the disputed language was to deny probationary employees all access to the grievance procedure in the event of termination. Additionally, the University contended that as Article 14, Section 1 of the agreement prevented any adverse employment action against an employee without "just cause," probationary employees were not entitled to the protection of this standard.

The Union focused on the last sentence of Article 14, Section 3. Union witnesses testified that the language from the first sentence of Article 14, Section 3 relied upon by the University was only intended to deprive probationary employees of the application of a "just cause" standard to a termination. However, the Union offered that the last sentence of the section implicitly recognized that although probationary

employees do not have access to a just cause standard, they do have the right to progressive discipline in all but the most serious cases. Therefore, the Union took the position that a probationary employee may have the right to file a grievance if a right to progressive discipline has been violated.

After reviewing the evidence, including conflicting testimony as to the negotiating history and proper application of Article 14, Section 3, the arbitrator agreed with the University and concluded that a probationary employee is not entitled to "just cause" protection. However, the arbitrator continued:

[T]he language of Section 3 appears on its face, in a negative way, to create an expectation that for at least some "serious" (and all lesser infractions as well), progressive discipline is available for probationary employees.

Interim Arbitration Award, June 26, 1996 at 10–11.

The Arbitrator also found *as a fact* that, while the collective bargaining agreement does not explicitly set forth a separate standard for judging the actions of probationary employees, the parties had seemingly agreed "that if there is a standard it is that the University may not be 'arbitrary and capricious' in meting out discipline." Interim Arbitration Award, June 26, 1996 at 10–11. The arbitrator further reasoned that even if the parties had not agreed that the arbitrary and capricious standard was applicable, he would have drawn the same conclusion from the negative inference emerging from Section 3 that "some minimum procedural due process standard applies." Interim Arbitration Award, June 26, 1996 at 11. Thus, Arbitrator Pereles initially determined that he had jurisdiction and that the grievance was arbitrable.

On August 21, 1996, a second day of hearing was held regarding the substance of the grievance. On October 14, 1996, a final award and opinion was rendered. Arbitrator Pereles sustained the grievance finding that, at a minimum, the University was required to provide Mr. Mitchell with an investigation and a statement of the reasons why he was being terminated. The arbitrator found that the situation was prejudged and that Mr. Mitchell was terminated before there was

any verification of the police report or the status of Mr. Mitchell's driver's license. Thus, according to the arbitrator, Mr. Mitchell had not been terminated for a contractually permissible reason. Arbitrator Pereles ordered that the termination be withdrawn and that Mr. Mitchell be reinstated with full back pay and benefits.

The University refused to comply with the award. Instead, it filed a petition for review with the Commonwealth Court. On September 3, 1997, a three-judge panel of that court vacated the arbitrator's award and reinstated Mr. Mitchell's termination. Specifically, the Commonwealth Court found that the plain meaning of the first sentence of Article 14, Section 3 precluded arbitration and that since no standard of due process was stated in the agreement, the arbitrator impermissibly determined whether the University's actions were arbitrary and capricious. Thereafter, we granted the Union's petition for allowance of appeal.

The ultimate issue raised by the Union is whether the Commonwealth Court erred in vacating the arbitrator's award. However, before addressing that issue, we must consider a threshold matter: what is the proper role of a court in reviewing an arbitrator's interpretation of the terms of a collective bargaining agreement?

Our court has spoken to this issue on numerous occasions. However, based upon the number of challenges to arbitration awards, this court's standard of review has seemingly become a boilerplate standard lacking in real meaning or practical application. Moreover, the court has stated different variations of the applicable standard which has led to a less than uniform proclamation of the appropriate degree of deference that a reviewing court should accord to a labor arbitrator's decision. Thus, we will revisit the appropriate role for a court to play in reviewing a labor arbitration award under Act 195.

To place the issue in context and to facilitate a full understanding of this issue, it is necessary to review the genesis of the standard of review of an Act 195 arbitration award and

this court's various expressions of that standard over the years.

It is axiomatic that the arbitration of labor disputes is highly valued and greatly favored in our Commonwealth. The benefits of arbitration are many. Arbitration is swifter, less formal, and less expensive than traditional dispute resolution by courts. Arbitration has been described as more responsive to individual needs and preferential in light of the ongoing relationship between employer and union. Perhaps most importantly, arbitration has been seen as a prime force in the policy of reducing industrial strife.[2] Indeed, the Legislature recognized the value of informal dispute resolution as arbitration of grievances is mandated under the PERA. 43 P.S. § 1101.903.[3] Under Act 195, it is for the parties to agree upon the arbitration procedure to be used. 43 P.S. § 1101.903. It is critical to note that the only caveat mentioned by the General Assembly with respect to the arbitration process is that the final step of the arbitration process shall provide for a *binding* decision. *Id.*[4] It is in the light of these factors that the role of the judiciary in labor arbitration has been considered.

2. Section 101 of the PERA provides:
   [I]t is the public policy of the Commonwealth and the purpose of this act to promote the orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety, and welfare. Unresolved disputes between the public employer and its employes are injurious to the public and the General Assembly is therefore aware that adequate means must be established for minimizing them and providing for their resolution.
   43 P.S. § 1101.101; *see also United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)("A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement.").

3. "The arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory." 43 P.S. § 1101.903.

4. Consistent therewith, Article 13, Section 1 of the collective bargaining agreement in the case at bar states in relevant part that, "[t]he decision of the arbitrator shall be final and binding upon the parties ..."

While in the context of labor relations, the final and binding arbitration of grievances is greatly favored, arbitration awards are not inviolate. On rare occasions, appellate courts are required to review an arbitrator's award. Twenty-two years ago, this court considered the proper degree of judicial intervention when reviewing labor arbitration awards under Act 195.

The seminal case regarding the role of an appellate court when reviewing a labor arbitration award under Act 195 is *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977). The standard of review first articulated by this court was based on federal case law. More specifically, our court looked to the famed "Steelworkers Trilogy"[5] to determine the appropriate standard of appellate review under Act 195.

In the Steelworkers Trilogy, the United States Supreme Court championed the use of arbitration to resolve contractual disputes in private sector labor relations. More importantly, the Court endorsed limited judicial involvement in the arbitration process.

> It is the arbitrator's construction which was bargained for and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

Yet the court also recognized that deference had its limitations.

---

**5.** The Steelworkers Trilogy consists of three cases decided by the United States Supreme Court on the same day. These cases are *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, *yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.,* at 597, 80 S.Ct. 1358 (emphasis supplied).

Thus, in a challenge to an arbitration award, the Court made clear that courts should avoid review of the merits. Merely because a court differs in its interpretation of the collective bargaining agreement is insufficient justification for vacating an award. The Court realized that such a review would undermine the important goal of arbitration as a final and binding resolution of contract disputes. *Id.* Yet, the Court also recognized that the arbitrator's actions are subject to some judicial oversight. An arbitrator cannot sit as King.

In interpreting Pennsylvania's statutory standards for judicial review, our court expressly adopted and followed the Steelworkers Trilogy's standards favoring arbitration and of judicial deference to an arbitrator's award. Specifically, the court in *Community College of Beaver County* found no conflict between the governing standard of review contained in the Pennsylvania Arbitration Act of 1927 and that recognized in the Steelworkers Trilogy. The court noted that the enactment of subsection (d) of section 171 of the Act of 1927 provides for modification or correction of an award where it is against the law and is such that had it been the verdict of the jury, the court would have entered different or other judgment notwithstanding the verdict. Our court made clear that this "nov" concept did not dictate that a closer or different scrutiny of an arbitration award would be available than under the approach of the Steelworkers Trilogy.[6] Consistent with

6. Subsequently, the Arbitration Act of 1927 was superceded by the Uniform Arbitration Act. 42 Pa.C.S.A. § 7301 *et seq.* Our court determined that the relevant provision of the new act, 42 Pa.C.S.A.

federal case law, the court recognized that the Commonwealth had essentially adopted the now oft cited standard that the arbitration award is legitimate "so long as it draws its essence from the collective bargaining agreement;" hence, the moniker "essence test." This court concluded that it was a sound standard for the review of labor arbitration awards. Stating the standard with greater specificity, the court declared:

> [W]here a task of an arbitrator, PERA or otherwise, has been to determine the intention of the contracting parties as evidenced by their collective bargaining agreement and the circumstances surrounding its execution, then the arbitrator's award is based on resolution of a question of fact and is to be respected by the judiciary if "the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention. . . ." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969).

*Community College of Beaver County*, 375 A.2d at 1275.

While the philosophy of judicial restraint was made clear in the court's initial expression of the essence test, the concept of the essence test has not been defined with complete consistency in subsequent cases by this court. Indeed, what exactly the essence test means, and the concomitant extent of judicial review, has proved to be a nettlesome question. A brief review of these varying iterations of the essence test illustrates the point.

Only one year after this court's decision in *Community College of Beaver County*, difficulty in translating the essence test became apparent.[7] While both the opinion in support of

§ 7302(d)(2), was a substantial reenactment of the corresponding provision of the Arbitration Act of 1927 and that the standard of review of an arbitration award under Act 195 is the same regardless of which arbitration act applies. *Pennsylvania State Education Assoc. v. Appalachia Intermediate Unit 08*, 505 Pa. 1, 476 A.2d 360, 362–63 (1984).

7. Interestingly, even in the same year that *Community College of Beaver County* was rendered, there remained a controversy over the proper standard of review. In *Leechburg Area School District v. Leechburg Education Association*, 475 Pa. 413, 380 A.2d 1203 (1977), Justice Manderino failed to garner a majority of votes, being criticized in

affirmance and the opinion in support of reversal in *Dauphin County Technical School Education Association v. Dauphin County Area Vocational Technical School Board,* 483 Pa. 604, 398 A.2d 168 (1978) cited the essence test as the appropriate standard for review, the court was equally divided as to how the essence test was to be applied in light of the facts of the case.

In 1981, the court embraced a different version of the essence test. While noting that it was applying the essence test, the court explained that the test required a determination as to "whether the terms of the agreement encompass the subject matter of the dispute. Where it is determined that the subject matter of the dispute is encompassed within the terms of the agreement, the validity of the arbitrator's interpretation is not a matter of concern to the court." *Leechburg Area School District v. Dale,* 492 Pa. 515, 424 A.2d 1309 (1981)(*Leechburg II* ). This explanation of the requirements suggests a much more deferential and limited standard of review of an arbitration award than that alluded to in *Community College of Beaver County.* Indeed, Justice Flaherty in his joining concurring opinion expressed his anticipation that the standard was now clear: "[T]he arbitrator in analyzing [a] dispute may have failed to properly perceive the question presented or erroneously resolved it, [but that] does not provide justification for judicial interference. Our inquiry ends once it is determined that the issue properly defined is within the terms of the agreement. So be it!" *Leechburg,* 424 A.2d at 1313. Yet, this approach was apparently seen by at least one member of the court as a departure from the essence test. Justice Roberts concurred in the result, as in his mind the outcome was consistent with *Community College of Beaver County.* Justice Roberts framed the test differently than the majority. "Here the arbitrator addressed the issue presented, the amount of the salary which should have been paid to appellant-teachers when rehired as substitutes, and his

concurring opinions by both Justice Roberts and Justice Pomeroy for failing to follow the standard announced in *Community College of Beaver County.*

determination is *rationally* derived from the agreement and may not be disturbed." *Id.* at 1313 (emphasis supplied).

However, shortly thereafter, a series of decisions by this court addressing the propriety of employee terminations voiced other variations of the test. *See Philadelphia Housing Authority v. Union of Security Officers,* 500 Pa. 213, 455 A.2d 625 (1983)(award found to be "manifestly unreasonable"); *County of Centre v. Musser,* 519 Pa. 380, 548 A.2d 1194 (1988)(issue whether award was "reasonable interpretation" and "rationally derived"); *Pennsylvania Liquor Control Board v. Independent State Stores Union,* 520 Pa. 266, 553 A.2d 948 (1989)(consideration of whether award constituted a "reasonable interpretation" was "rationally derived" and "manifestly unreasonable").

Most recently, a plurality of this court stated that the essence test requires that "an arbitrator's interpretation be upheld if it can, in any rational way, be derived from the language and context of the agreement. When an issue, properly defined, is within the terms of a collective bargaining agreement and the arbitrator's decision can in a rational way be derived from the terms of the agreement, one can say that the decision draws its 'essence' from the agreement, and reversal is not warranted even if a court believes that the decision, though rational, is incorrect." *Delaware County v. Delaware County Prison Employees Independent Union,* 552 Pa. 184, 713 A.2d 1135, 1137 (1998)(citing *Greater Johnstown Area Vocational-Technical School v. Greater Johnstown Area Vocational–Technical Education Association,* 520 Pa. 197, 553 A.2d 913, 914–15 (1989)).

Thus, we are confronted with a standard of review that has been stated using differing verbiage and that has signified various degrees of judicial deference. At times, the court has suggested extreme deference by stating that as long as the issue is covered by the agreement, the inquiry is at end. *Leechburg II.* On one hand, this approach is true to the concept of final and binding arbitration. Conversely, the drawback of this approach is that it allows an arbitration award to be upheld where the award is so without support or

is so illogical, that the parties could not have possibly intended to be so bound. Parties to a collective bargaining agreement rightfully presume that an arbitrator's decision will not be without basis nor the product of insanity.

On the other end of the spectrum is the language used by our court indicating a standard of review looking to the "reasonableness" of the arbitrator's award. A mere reasonableness standard encourages a reviewing court to assert its own brand of labor relations philosophy. It emboldens a court to become a "superarbitrator" and to vacate an award when it finds that the award is at odds with how the members of the court would have decided the case. The admonition against such judicial intervention was persuasively stated by this court in *Scranton Federation of Teachers v. Scranton School District*, 498 Pa. 58, 444 A.2d 1144, 1147 (1982): "The parties to a collective bargaining agreement ha[ve] bargained for the arbitrator's construction, not the court's; thus, a court has no business intruding into the domain of the arbitrator because its interpretation of the agreement differs from his." The court's rejection of a broad review is well founded. This approach takes away the dispute resolution procedure bargained for, and agreed to, by the parties, as well as undermines the many benefits of labor arbitration as a form of dispute resolution. Moreover, when a court vacates an arbitrator's award as being at odds with its idea of a proper resolution of the dispute, it inspirits employers and employees alike to seek judicial review when they do not prevail at arbitration, in the hope that they too can reargue their case, and win in court what they could not achieve in arbitration.

With these considerations in mind, we believe that the role for a court reviewing a challenge to a labor arbitration award under Act 195 is one of deference. We hold that in light of the many benefits of arbitration, there is a strong presumption that the Legislature and the parties intended for an arbitrator to be the judge of disputes under a collective bargaining agreement. That being the case, courts must accord great deference to the award of the arbitrator chosen by the parties. A fortiori, in the vast majority of cases, the

decision of the arbitrator shall be final and binding upon the parties. However, there exists an exception to this finality doctrine. The arbitrator's award must draw its essence from the collective bargaining agreement. Pursuant to the essence test as stated today, a reviewing court will conduct a two-prong analysis. First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.[8, 9]

We now must determine whether the Commonwealth Court properly vacated the arbitrator's award in this case. We could remand the matter to the Commonwealth Court for consideration in light of our opinion today. However, because the standard of review announced today is largely a reaffirmation of the original essence test as stated in *Community College of Beaver County*, for purposes of judicial economy, and because the parties have briefed the issue, thus assisting

8. We acknowledge that the terms "rational" and "reasonable" have often been used interchangeably as part of the standard of review. Indeed, in common parlance, the two words have similar meanings. However, we find that in the context of review of an Act 195 labor arbitration award, determining an award to rationally be derived from a collective bargaining agreement connotes a more deferential view of the award than the inquiry into whether the award is reasonable. An analysis of the "reasonableness" of an award too easily invites a reviewing court to ignore its deferential standard of review and substitute its own interpretation of the contract language for that of the arbitrator. Thus, we find that in this very limited context, a review of the "reasonableness" of an award is not the proper focus.

9. In *Pennsylvania State Police v. Pennsylvania State Troopers Association (Betancourt)*, 540 Pa.66, 656 A.2d 83 (1995), this court stated that the statutorily imposed scope of review of an Act 111 grievance arbitration award is narrow certiorari. We make clear that this extremely limited narrow certiorari scope of review is distinct from, and inapplicable to, our analysis of the essence test.

our court with their advocacy, we will consider whether vacatur of the arbitration award was proper.

The dispute before the arbitrator was initially one of jurisdiction, and then, whether the University violated the collective bargaining agreement when it terminated Mr. Mitchell. Two provisions of the collective bargaining agreement were considered and interpreted by the arbitrator to resolve these issues: Article 13 of the agreement, "Grievance and Arbitration" and Article 14, "Discharge, Demotion, Suspension, and Discipline."

Article 13 provides that the procedure explained therein was to be the sole and exclusive procedure for the resolution of grievances.[10] Section 2 of Article 13 states that if a question is raised as to whether the arbitrator has jurisdiction to hear a case, this issue must be heard and decided by the arbitrator prior to hearing and deciding the merits of the case. Should an arbitrator decide that he has jurisdiction to hear the merits of the dispute, the hearing on the merits is to occur as soon as reasonably feasible.

Article 14 goes to the substance of the dispute. The crux of Article 14, Section 1, as is found in most collective bargaining agreements, is that an employee will not be demoted, suspended, discharged, or be subject to any disciplinary action, without just cause. Section 3 of Article 14 expressly covers the rights of probationary employees. Specifically, Section 3 indicates that during a professional employee's initial twelve months of employment, the provisions of Article 14 shall not apply. Section 3 further recognizes that during a professional employee's probationary period, if the President or his designee determines that the professional employee will not be retained, the professional employee will be given 90 days notice prior to termination, which notice may include paid or unpaid periods of time. Finally, in Section 3 of Article 14, the

10. The four step grievance procedure found in Section 1 of Article 13 provides for: (1) oral or written presentation of the grievance to the employee's immediate supervisor within 25 days; (2) written presentation to the University President; (3) appeal to the Chancellor of Higher Education; and (4) appeal to arbitration.

parties recognized that for some serious offenses, progressive discipline is inappropriate and that immediate removal may be warranted and the 90 day notice period referred to in this section shall not be applicable.

■ Applying our standard of review as stated today, it is clear from the above that the issues of jurisdiction and proper termination were properly defined within the terms of the collective bargaining agreement. Thus, the arbitrator's award passes the first prong of the essence test, that is, "the issues as properly defined are within the terms of the collective bargaining agreement." Accordingly, we turn to consideration of whether the arbitrator's award can be understood as being rationally derived from the collective bargaining agreement.

As previously noted, the first hearing was dedicated to the issue of jurisdiction. The University focused upon the language contained in Article 14, Section 3 which indicates that during a professional employee's first twelve months of employment, the provisions of Article 14 would not apply. It was the University's position that this language completely precluded a probationary employee from filing any grievance to challenge his termination and denied the employee the protection that his termination be for just cause. Conversely, the Union concentrated on the last sentence of Article 14, Section 3 which indicates that in some serious offenses, progressive discipline is inappropriate, and immediate removal may be warranted. The Union argued that although a probationary employee may not be entitled to application of a just cause standard before an adverse employment action, the language of Section 3 indicated that probationary employees do have the right to progressive discipline in all but the most serious cases. This argument was based on the language of Section 3 which offers that for some serious offenses, progressive discipline is inappropriate and that immediate removal may be warranted and the 90 day notice period is not be applicable. The offense in this case was not so serious as to dispose of the need for the 90 day notice. Thus, according to the Union, progressive discipline was appropriate and the arbitrator had jurisdiction to consider the grievance.

After reviewing the evidence and the conflicting interpretations, the arbitrator determined that pursuant to the first sentence of Section 3, just cause protection was not available for probationary employees.[11]  However, the arbitrator went on to conclude that based upon the University having provided a 90 day notice pursuant to the second sentence of Article 14, Section 3,[12], the University had implicitly determined that the offense committed by Mr. Mitchell was not so serious so as to permit dismissal without the 90 day notice pursuant to the third sentence of Section 3.[13]  Rather, the offense was an infraction to which the 90 day notice and progressive discipline was potentially appropriate.  As progressive discipline was available, the arbitrator determined that he had jurisdiction to consider the grievance contesting Mr. Mitchell's termination.

Finally, the arbitrator made a factual finding that while the agreement did not set forth an express standard for judging the actions of probationary employees in determining progressive discipline, the parties seemingly agreed that if there is a standard, it was that the University could "not be 'arbitrary and capricious' in meting out discipline."  The arbitrator concluded that even if the parties had not agreed to such a standard, such a standard was based upon the negative inference from Article, 14 Section 3 that "some minimal procedural due process standard applies."  Interim Arbitration Award June 26, 1996 at p. 11.

11.  The first sentence of Article 14, Section 3 states, "During a professional employees [sic] initial twelve (12) months of employment, the provisions of this article shall not apply."  Article 14 Section 1 states, "The Employer shall not demote, suspend, discharge, or take any disciplinary action against a professional employee without just cause."

12.  The second sentence of Article 14, Section 3 states, "If at any point during a professional employee's initial probationary period, the President or their [sic] designee(s) determine that the professional employee will not be retained, the professional employee will be given 90 days notice prior to termination, which may include paid or unpaid periods of time."

13.  The last sentence of Article 14, Section 3 states, "The parties hereto recognize that for some serious offenses, progressive discipline is inappropriate and that immediate removal may be warranted and such 90 days [sic] notice period referred to in this section shall not be applicable."

At the subsequent hearing, the circumstances under which Mr. Mitchell had been terminated were reviewed to see if the actions of the University were arbitrary and capricious. The arbitrator concluded, as noted above, that the University acted in an arbitrary and capricious manner when it terminated Mr. Mitchell. Specifically, the arbitrator found that the University failed to promptly investigate the matter, failed to give Mr. Mitchell a statement of reasons why he was being terminated, and did not to provide him with an opportunity to respond meaningfully.

We find that the arbitrator's decision regarding the proper interpretation of Article 14, Section 3, both as to jurisdiction and as to the merits, has met the second prong of the essence test. The arbitrator considered two conflicting, yet supportable, interpretations of Section 3 of the collective bargaining agreement and chose one of the two interpretations. Further, the arbitrator made a factual determination as to an agreement between the parties as to the process due if the probationary employee was permitted to proceed with his grievance. Simply stated, the award was rationally derived from the collective bargaining agreement.

While it is doubtless that other tribunals may have interpreted the language differently and found the probationary employee to be prohibited from filing a grievance, it is not a court's role to vacate an arbitration award on that basis. Rather, deference is the touchstone of the appropriate standard of review. The Commonwealth Court failed to make the distinction between an irrational award and one that merely chooses between differing interpretations of contract language. The court made its own evaluation of the conflicting interpretations of the relevant language and impermissibly vacated the arbitrator's award. Thus, we conclude that the Commonwealth Court erred in vacating the arbitrator's award.

The University argues that even if Mr. Mitchell was properly permitted to file a grievance, the arbitrator usurped his authority by adding a standard not found in the collective bargaining agreement and improperly dispensed his own brand of industrial justice. More specifically, according to the

University, and as found by the Commonwealth Court, there is no arbitrary and capricious standard in the agreement and the injection of such a standard requires that the award be vacated. We disagree.

The arbitrator interpreted the provisions of the collective bargaining agreement and found that probationary employees are not entitled to the protection of a just cause standard. The arbitrator went on to find that Article 14, Section 3 did contemplate some due process requirement. This interpretation was rational in light of the language of the agreement. Additionally, the arbitrator concluded, as a factual matter, that the parties seemingly agreed that if a standard was implicit in the agreement, it would be an arbitrary and capricious standard. The University acknowledges that its representative stated that if the arbitrator were to find that if a standard was required, it would be no more restrictive than an arbitrary and capricious standard. Therefore, the arbitrator's use of the arbitrary and capricious standard is supported by a rational interpretation of the collective bargaining agreement and the statements by the parties. *Community College of Beaver County*, 375 A.2d at 1275 (award must be respected if interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, *and any other indicia of the parties' intention.* (citation omitted)(emphasis supplied)).

As we find that the arbitrator's award draws its essence from the collective bargaining agreement, it must be upheld.[14] The Commonwealth Court's decision is hereby reversed and the award of the arbitrator is hereby reinstated.

**14.** In light of the nature of the dispute before us, it is not necessary for our court to address the distinct issue of whether there exists a separate public policy basis on which a court may vacate an arbitrator's award or whether such an analysis is subsumed within the essence test as stated today. *See W.R. Grace and Company v. Local Union 759, International Union of the United Rubber, Cork, Linoleum and Plastic Workers of America,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *United Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

Chief Justice FLAHERTY files a concurring opinion in which Justice SAYLOR joins.

Justice CASTILLE files a concurring and dissenting opinion.

Justice NIGRO files a concurring and dissenting opinion.

Justice ZAPPALA files a dissenting opinion in which Justice CASTILLE joins.

FLAHERTY, Chief Justice, concurring.

I join the majority. In *Leechburg Area School District v. Dale*, 492 Pa. 515, 424 A.2d 1309 (1981), I wrote: "Our inquiry ends once it is determined that the issue properly defined is within the terms of the agreement." Inherent in this view is that the arbitrator's interpretation must rationally be derived from those terms. However, the inquiry as to whether the interpretation is rationally derived has nothing to do with whether the reviewing court agrees with the interpretation or even whether the interpretation is, in the court's view, "reasonable." Instead, a rational interpretation is simply one in which the arbitrator applies the terms of the agreement to the problem at hand. In this case, the arbitrator's interpretation addressed a problem within the agreement by the application of the terms of the agreement. This is a case, therefore, in which courts should not intervene.

Justice SAYLOR joins this concurring opinion.

CASTILLE, Justice, concurring and dissenting.

I concur in the result reached by the majority; however, I would espouse a further standard of review than that set forth by the majority. Initially, I approve of the majority's two-pronged approach and agree with the notion that the first prong should encompass the essence test. However, once a reviewing court has found, as required by the majority, that the issue before it falls within the terms of the collective bargaining agreement, then the second prong should, in my

view, include further review to determine if the decision of the arbitrator is manifestly unreasonable.

Indeed, I believe that the majority alludes to this further review but fails to specifically adopt this as an appropriate approach. In its discussion of *Leechburg Area School District v. Dale*, 492 Pa. 515, 424 A.2d 1309 (1981) (*Leechburg II* ), the majority terms the holding therein as one evidencing "extreme deference" to an arbitrator's decision. The majority then correctly points out the drawbacks of an extreme deference approach by noting that "it allows an arbitration award to be upheld where the award is so without support or is so illogical, that the parties could not have possibly intended to be so bound." Op. at 413. I believe that this language is, in essence, an acknowledgment that arbitration decisions are subject to judicial review where they are manifestly unreasonable. To allow review only where the arbitrator's decision cannot be rationally derived from the collective bargaining agreement is too limiting and places unbridled discretion in the hands of individual arbitrators. The majority's standard of review would allow an arbitrator's decision to stand if it could be made under the terms of the collective bargaining agreement even if the decision was manifestly unreasonable under the facts of the case. I am in accord with the majority that a straight reasonableness standard permits more judicial review than is desirable. Thus, I would have the second prong of the test include that the arbitrator's award will be upheld if the arbitrator's interpretation can be rationally derived from the collective bargaining agreement and the decision is not manifestly unreasonable.

Applying this standard to the matter herein, I would affirm the decision of the Commonwealth Court. The arbitrator's decision below was manifestly unreasonable given the unequivocal language of the collective bargaining agreement. Only through tortured mental gymnastics did the arbitrator "create" an "expectation" of "progressive discipline" where no such language appears in the collective bargaining agreement. Interim Arbitration Award, June 26, 1996 at 10–11. Where the collective bargaining agreement clearly states that it shall

not apply during an employee's initial twelve (12) months of employment, the arbitrator's decision that it does apply is manifestly unreasonable and should be capable of judicial review.

Accordingly, I dissent.

NIGRO, Justice, concurring and dissenting.

I concur in the majority's articulation of the two-prong inquiry necessary to determine whether an arbitrator's award is reviewable by the courts. However, on the facts of this case, I would hold that the arbitrator did not have jurisdiction to hear the grievance because Mr. Mitchell was a probationary employee at the time of his termination.

Article 14, Section 3 of the subject collective bargaining agreement plainly says: "During a professional employees [sic] initial twelve (12) months of employment, the provisions of *this Article shall not apply.*" (Emphasis added). The collective bargaining agreement could not be more definitive that probationary employees are not governed by any of the bargained-for provisions applicable to employees who have satisfied the probationary period and been retained by the employer. Thus, without further inquiry, I would find that the arbitrator improperly arbitrated a grievance of an employee specifically excluded from coverage under the collective bargaining agreement.

ZAPPALA, Justice, dissenting.

I dissent and would affirm on the basis of the well-reasoned opinion of the Commonwealth Court, which I reproduce in full as Appendix A, as it was previously unpublished. I note particularly the following straightforward analysis of the issue, which contrasts markedly with the obfuscation employed by the majority:

Article 13 of the Agreement . . . provides:

The arbitrator shall neither add to, subtract from, nor modify the provisions of this Agreement. The arbitrator shall confine himself/herself to precise issues submitted

for arbitration and shall have no authority to determine any issues not submitted to him/her.

The Agreement explicitly provides that the provisions of Article 14 shall not apply during a professional employee's initial twelve months of employment. Despite this plain language in the Agreement and the undisputed fact that Grievant received a ninety day notice of termination in the tenth month of his employment, the arbitrator found the matter to be arbitrable.

In deciding the precise issue for arbitration, the arbitrator further determined that some form of "progressive discipline" was available for probationary employees, but concluded that the language of the Agreement does not provide any standard nor define this concept. Nonetheless, he imposed a minimal standard of procedural due process and found that the arbitrable issue was whether University acted in an "arbitrary or capricious" manner in discharging Grievant....

[T]he arbitrator's initial determination violated the plain meaning of the first sentence of Article 14 Section 3. This sentence clearly states that probationary employees cannot grieve under Article 14. Moreover, while it may be that minimal due process provisions should have been incorporated into the Agreement, the arbitrator expressly indicated that no standard or definition existed within the four corners of the parties [sic] Agreement. Finally, ... the arbitrator determined that the issue for arbitration was whether Grievant's discharge was "arbitrary and capricious," despite the fact that these terms do not appear in Article 14.

Memorandum Opinion at 421–22.

Justice CASTILLE joins this Dissenting Opinion.

APPENDIX A

MEMORANDUM OPINION

The State System of Higher Education at Cheyney University (University) appeals from an arbitrator's award which sustained a grievance filed by the State College and Universi-

ty Professional Association (Association) on behalf of Frank Mitchell (Grievant), a probationary employee.

The relevant facts are not in dispute. On March 28, 1994, Grievant began employment with the University in the Admissions Office, as a State University Administrator 2, Admissions Counselor/Recruiter responsible for "outreach responsibilities." On November 8, 1994, while returning from a job fair in Washington, D.C., Grievant was stopped by the Baltimore Police in a University vehicle and issued a ticket for speeding. Because Grievant was unable to produce a valid driver's license, the University's vehicle was impounded.

Grievant remained with the vehicle at the Police Barracks overnight and the following morning, Grievant attempted to contact his supervisor, Sharon L. Cannon (Cannon), Director of Admissions. While Grievant was unable to speak directly with Cannon, he did leave her a message that he would be unable to attend work for personal reasons. Grievant further contacted the University Motor Pool in regards to the incident. Later that day, the Director of Facilities at the University became aware of the impounded vehicle, and sent two employees to retrieve it.

At some point on November 9, 1994, Cannon learned of this incident from the University's Director of Public Affairs. Without any further confirmation or verification of the allegations and before hearing Grievant's version of the events, Cannon recommended to the Vice President of Student Affairs that Grievant be terminated. When Grievant returned to his office, Cannon informed Grievant of her recommendation. On November 10, 1994, Cannon assigned Grievant to non-recruiting responsibilities and reassigned Grievant's recruitment responsibilities to other recruiting staff.

Pursuant to the grievance package, a pre-disciplinary hearing was conducted in November 1994, but, the "record is devoid of any exchanges thereafter until ... January 19, 1995." Arbitration Award, p. 4. On January 19, 1995, Grievant received a ninety-day notice of termination effective April 21, 1995, but, the notice contained no explanation or basis for

the University's actions.[1] On February 22, 1995, the Association filed a grievance challenging Grievant's discharge, in accordance with the procedures set forth in Article 13 of the Collective Bargaining Agreement (Agreement) between the University and Association. On January 23, 1996, pursuant to those same procedures, the Association issued a Demand for Arbitration and on May 15, 1996, a hearing was conducted to determine the threshold issue of arbitrability.

Before the arbitrator, Grievant argued that his dismissal was arbitrable as a violation of Article 14, Section 3 of the Agreement. Conversely, the University contended that Article 14 could not have been violated, because the provisions of that Article are expressly inapplicable to disciplinary actions affecting probationary employees. Article 14 of the CBA provides:

### DISCHARGE, DEMOTION, SUSPENSION AND DISCIPLINE

*Section 1.* The Employer shall not demote, suspend, discharge, or take any disciplinary action against a professional employee without just cause. A professional employee may appeal a demotion, suspension or discharge beginning at the second step of the grievance procedure. Association shall be notified by the Employer of any demotion, suspension or discharge.

*Section 2.* Any action instituted by the Employer under Section 1 of the Article shall be implemented within a reasonable period of time after the event giving rise to such disciplinary action of (sic) knowledge thereof.

*Section 3. During a professional employees (sic) initial twelve months of employment (sic), the provisions of this Article shall not apply.* If at any point during a profession-

---

1. Apparently, Grievant missed a scheduled recruiting appointment at Philadelphia High School for Girls on December 6, 1994. The parties dispute as to whether this incident resulted from the University's failure to reassign this recruitment responsibility, as it had done in November with Grievant's other duties, or Grievant's failure to notify the University as to the existence of the appointment.

al employee's initial probationary period, the President or their (sic) designee(s) determine that the professional employee will not be retained, the professional employee will be given 90 days notice prior to termination, which notice may include paid or unpaid periods of time. The parties hereto recognize that for some serious offenses, progressive discipline is inappropriate and that immediate removal may be warranted and such 90 days (sic) notice period referred to in this section shall not be applicable.

(Emphasis Added). The arbitrator agreed, in part, with the University that the "just cause" protection afforded by Article 14, Section 1 of the Agreement was inapplicable to probationary employees. The arbitrator further determined:

The language of Section 3 appears on its face, in a negative way, to create an expectation that for at least some "serious" (and all lesser infractions as well), progressive discipline is available for probationary employees. However, the language does not provide any standard nor does it define progressive discipline.

The Parties appear to have agreed during the Hearing that if there is a standard it is that the State System may not be "arbitrary and capricious" in meting out discipline. But even if the Parties had not agreed, the Arbitrator would have concluded that some minimal procedural due process standard applies. The Arbitrator agrees with the Parties that the State System may not act in an "arbitrary or capricious" manner in applying discipline.

(R.R., pp. 10–11a). Thus, the arbitrator concluded that the Association was not foreclosed from claiming a violation of Article 14 Section 3 of the Agreement, and scheduled a hearing on the merits for August 21, 1996. The merits hearing was then held to determine the extent of the notice required before termination and "whether the actions taken were arbitrary and capricious." *Id.* at 11a.

At the hearing on the merits before the arbitrator, each party was afforded a full and fair opportunity to introduce

relevant evidence in support of its position and to examine and cross-examine witnesses. Based upon the evidence introduced at the hearing, the arbitrator found that Cheyney was required "[a]t a minimum" to provide Grievant with a "investigation and a statement of the reasons why he is being terminated." Arbitration Award, p. 15. The arbitrator further found that "Ms. Cannon's precipitous recommendation for termination" had the "appearance of pre-judging the situation and poisoning any further even handed evaluation of what, in fact, transpired." *Id.* Because "at the time of the notice of dismissal" Cheyney had not "verified the Baltimore Police Report or the status of his (Grievant's) driver's license," the arbitrator determined that Grievant's termination was not for contractually permissible reasons and sustained his grievance. *Id.* at 15–16.[2] The University petitions for this Court's review.

On appeal, the University first challenges the arbitrator's initial determination of arbitrability. In this respect, the University contends that an arbitrator is confined to interpreting and applying the terms of the Agreement and does not sit to dispense his own brand of industrial justice. The University further contends that the plain meaning of the Agreement is unmistakably clear and requires no interpretation, in that "[d]uring a professional employees [sic] initial 12 months of employment, the provisions of this Article *shall not apply.*" The University argues that by holding that the grievance filed under this Article was an arbitrable matter, the arbitrator's Interim Award violates the express terms of the Agreement, constitutes an unreasonable interpretation that is contrary to the parties expressed intent, and must be vacated as it fails to draw its essence from the Agreement.

Conversely, the Association contends that the intent of the parties as manifested in the provisions of the Agreement is a question of fact, and that this Court cannot second guess an

---

**2.** The arbitrator reinstated Grievant to his prior position with full back pay and benefits less substituted earnings. The arbitrator further defined the time frame to be used for Grievant's probationary evaluation.

arbitrator's factfinding so long as the arbitrator is even arguably construing or applying the contract. The Association further contends that where, as here, the arbitrator interprets an Agreement in favor of the arbitrability of a dispute, this Court should be slow to disagree. Because the last sentence of Article 14, Section 3 of the Agreement supports a determination that probationary employees are entitled to minimum due process considerations, the Association argues that this Court should not act as a "superarbitrator" and substitute our judgment for that of the arbitrator on the issue of arbitrability.

In-public employment situations, the law is well settled that a reviewing court may not overturn an arbitrator's award, so long as it draws its essence from the parties' collective bargaining agreement. *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA),* 473 Pa. 576, 375 A.2d 1267 (1977). Under the essence test, the reviewing court is confined to a determination of whether the arbitrator's decision represents a reasonable or rational interpretation of the collective bargaining agreement between the parties. *County of Centre v. Musser,* 519 Pa. 380, 548 A.2d 1194 (1988).

Article 13 of the Agreement, entitled "Grievance and Arbitration," defines a grievance as "a dispute which may arise concerning the application, meaning or interpretation of this Agreement." This Article further provides:

> The arbitrator shall neither add to, subtract from, nor modify the provisions of this Agreement. The arbitrator shall confine himself/herself to precise issues submitted for arbitration and shall have no authority to determine any issues not submitted to him/her.

In the instant case, the parties dispute whether disciplinary actions affecting probationary employees are arbitrable under Article 14. The Agreement explicitly provides that the provisions of Article 14 shall not apply during a professional employee's initial twelve months of employment. Despite this plain language in the Agreement and the undisputed fact that

Grievant received a ninety day notice of termination in the tenth month of his employment, the arbitrator found the matter to be arbitrable.

In deciding the precise issue for arbitration, the arbitrator further determined that some form of "progressive discipline" was available for probationary employees, but concluded that the language of the Agreement does not provide any standard, nor define this concept. Nonetheless, he imposed a minimal standard of procedural due process and found that the arbitrable issue was whether University acted in an "arbitrary or capricious" manner in discharging Grievant.

An arbitrator's award cannot be said to draw its essence from the collective bargaining agreement, where it violates the express terms of that agreement by "changing the language of the contract or adding new and additional provisions." *American Federation of State County & Municipal Employees, District Council 84 v. City of Beaver Falls,* 74 Pa.Cmwlth. 136, 459 A.2d 863, 865 (1983); *State System of Higher Educ. v. United Plant Guard Workers of America, Local Union 509,* 149 Pa.Cmwlth. 193, 612 A.2d 645, 647 (1992), *appeal denied,* 533 Pa. 613, 618 A.2d 403 (1992). Moreover, where the arbitrator's words exhibit an infidelity to the agreement, courts have no choice but to refuse enforcement of the award. *Southern Tioga Educ. Ass'n v. Southern Tioga School Dist.,* 668 A.2d 260 (Pa.Cmwlth.1995), *appeal denied,* 544 Pa. 665, 676 A.2d 1203 (1996).

After carefully reviewing Article 14 of the Agreement, we fail to perceive how the arbitrator's initial determination of arbitrability can be construed as a rational interpretation of the instant agreement between the parties. In the present case, the arbitrator's initial determination violated the plain meaning of the first sentence of Article 14 Section 3. This sentence clearly states that probationary employees cannot

grieve under Article 14. Moreover, while it may be that minimal due process provisions should have been incorporated into the Agreement, the arbitrator expressly indicated that no standard or definition existed within the four corners of the parties Agreement. Finally, while Article 13 expressly provides that the arbitrator lacks the requisite authority to "ad to, subtract from, nor modify the provisions of this Agreement," the arbitrator determined that the issue for arbitration was whether Grievant's discharge was "arbitrary and capricious," despite the fact that these terms do not appear in Article 14.

Because the issue of whether the University's action were "arbitrary and capricious" was not rationally derived from the essence of the Agreement, this Court has no choice but to reverse the arbitrator's determination of arbitrability.[3]

### ORDER

AND NOW, this 3rd day of September, 1997, the award of the arbitrator in the above-captioned matter is hereby vacated, and the State System of Higher Education's decision to dismiss Frank Mitchell is reinstated.

---

3. Because we conclude that the instant matter was not arbitrable, we need not address the merits of the grievance.