The SCHOOL DISTRICT OF
PHILADELPHIA,
Appellant

v.

PHILADELPHIA FEDERATION
OF TEACHERS, LOCAL 3.

Commonwealth Court of Pennsylvania.

Argued May 13, 2014.
Decided July 14, 2014.

Talib N. Ellison, Philadelphia, for appellant.

Ralph J. Teti, Philadelphia, for appellee.

BEFORE: DAN PELLEGRINI, President Judge, and RENÉE COHN JUBELIRER, Judge, and ROCHELLE S. FRIEDMAN, Senior Judge.

OPINION BY President Judge PELLEGRINI.[1]

The School District of Philadelphia (District) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court) affirming an arbitrator's award which sustained the grievance filed by the Philadelphia Federation of Teach-

1. This opinion was reassigned to the author-

ing judge on June 13, 2014.

ers, Local 3 (PFT) on behalf of Marshall Murphy and Valerie Polk (collectively, Grievants) following their layoffs from teaching positions at Mastbaum Vocational–Technical High School (Mastbaum). For the reasons that follow, we reverse the trial court's order and remand the case to the arbitrator for further proceedings.

Murphy and Polk occupied positions with the District since 1976 and 1977, respectively.[2] In June 2012, they received layoff notices indicating that the District was eliminating their positions due to a decline in student enrollment and that they were being furloughed. The PFT submitted a grievance, asserting that Grievants' job-secured positions could not be eliminated pursuant to Article IX, Section B(1) of the collective-bargaining agreement (CBA) between the District and the PFT, which provides:

1. The parties agree that all employees who were regularly appointed to a full-time and/or part-time position during the 1979–1980 school year (*i.e.* September 1, 1979 to June 30, 1980) shall continue to be employed in their positions and be guaranteed full and complete job security during the term of this Agreement, **except** that in each job classification, employees may be laid off only in proportion to the projected decline in pupil enrollment as of the allotment date for each year of this Agreement, such layoff to be effective in any year only after giving notice to affected employees and to the Federation on or before June 30 of that year. (Emphasis added.)

(Reproduced Record (R.R.) at 68a (emphasis added).) The parties submitted to arbitration.

Before the arbitrator, the parties stipulated that aside from the instant Grievants, "no other job secured teacher has ever been laid off in the School District of Philadelphia." (N.T., 11/20/12, at 12.) The parties also stipulated that the Grievants had the least seniority of all teachers teaching in the areas of certification held by them. (N.T., 12/14/12, at 16; R.R. at 305a.)

In opposition to the layoffs, the PFT presented the testimony of Arlene Kempin, the PFT's General Vice President and Chief Personnel Officer, who stated that on the few occasions that the District did lay off job-secured teachers, the District rescinded the layoffs and reinstated the teachers. (N.T., 12/14/12, at 6–9.) She further testified that in some instances, job-secured teachers have been placed as overappointments, meaning that they have been assigned to schools without authorized allocated positions but teach there until authorized positions become available. (*Id.* at 11.). There was no testimony that those previous layoffs were done as a result of a decline in enrollment.

In support of the layoffs, the District offered the testimony of Theresa McKinzie, the Executive Director of School Resource Support, who stated on cross-examination that over her eight-year course of tenure, there has been an across-the-board decline in enrollment. (*Id.* at 17, 22.) The District also presented the testimony of Wayne Harris, its budget director, who testified that the District elected to layoff the Grievants due to the severity of the District's financial situation. (*Id.* at 30, 36.) In this regard, the District stipulated that it was a distressed district pursuant to

---

**2.** Murphy is certified to teach industrial arts and most recently taught business entrepreneurship at Mastbaum, where he coached the football, basketball, and baseball teams. Polk is certified to teach home economics and most recently taught in Mastbaum's culinary-arts program. Neither Murphy nor Polk is certified to teach the core subjects of math, science, history, or English. (Arb. Award at 5; N.T., 11/20/12, at 42, 53, 70.).

Section 696 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 6–696, and had been since November 2001. (*Id.* at 32.)

After a hearing, the arbitrator ordered that both teachers be reinstated finding that Article IX, Section B(1) of the CBA is ambiguous because, on the one hand, it purported to provide all employees who were regularly appointed from September 1, 1979 to June 30, 1980, with absolute job security while, on the other hand, it allowed proportional layoffs regarding projected decline in enrollment. To resolve this purported ambiguity, the arbitrator examined the parties' past practices and found a "long and unbroken employment of job secured Teachers ... despite the District having longstanding and repeated budget difficulties," based on that fact that "prior to the Grievants no job secured Teachers were ever laid off," even when they were placed as overappointments, and

that when they were laid off, the District promptly reinstated them. (Arb. Award at 19–20.)

Based on that "past practice," the arbitrator concluded that the CBA precluded laying off job-secured teachers. Besides ordering reinstatement, he ordered that Grievants be made whole for lost wages and benefits.[3] The District appealed the award to the trial court which found that the award drew its essence from the CBA,[4] and this appeal followed.[5]

The only issue before us is whether the arbitrator's conclusion that Article IX, Section B(1) is ambiguous can rationally be derived from the CBA. The plain language of the provision accomplishes two tasks. First, it establishes a general rule of "full and complete job security" for all employees who were regularly appointed from September 1, 1979 to June 30, 1980, including Grievants. Second, it sets forth an

3. Having determined that the exception in Article IX, Section B(1) was inapplicable to job-secured teachers, the arbitrator did not rule upon whether the conditions set forth in the exception had been satisfied. (Arb. Award at 21–22.).

4. The trial court ordered the District to file a statement of errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure. In the trial court's opinion, it found that the District's statement of issues did not comply with Rule 1925(b) because it was "lengthy and far from concise" and "a twenty-four (24) page memorandum of law [that] fails to identify a single issue on appeal." (Trial Ct. Op., 11/1/13, at 5.) Thus, the trial court stated that it was precluded "from providing a meaningful review of [the District's] claims." (*Id.*) However, notwithstanding the deficiencies in the Rule 1925(b) statement, the trial court proceeded to analyze the award, determined that it was rationally derived from the CBA, and noted that the arbitrator "properly used evidence of the parties' past practice to clarify ambiguous language in the [CBA]." (*Id.* at 10–11.).

We decline to find that the District waived all issues on appeal by failing to conform with Pa. R.A.P.1925(b) because the trial court sufficiently addressed the relevant issues in its 1925(a) opinion to permit this court to conduct a clear and meaningful appellate review. *Cf. Eiser v. Brown & Williamson Tobacco Corporation,* 595 Pa. 366, 938 A.2d 417, 427–28 (2007) (finding that appellate review was not foreclosed based on the large number of issues included in a Pa. R.A.P.1925(b) statement).

5. A court reviewing an arbitrator's interpretation of a CBA must apply the deferential "essence" test. *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA),* 560 Pa.135, 743 A.2d 405, 413 (1999). Pursuant to the essence test, the court must determine: (1) if the issue is within the terms of the CBA; and (2) if the arbitrator's interpretation can rationally be derived from the CBA. *Id.* In other words, an arbitrator's award should be vacated only "where the award indisputably and genuinely is without foundation in, or fails to logically flow from" the CBA. *Id.*

exception to this rule, whereby generally job-secured teachers "may be laid off only in proportion to the projected decline in pupil enrollment. . . ." (R.R. at 68a.)[6] The provision is not reasonably susceptible of "different constructions and capable of being understood in more than one sense" simply because it establishes a general rule and an exception to that rule. *Hutchison v. Sunbeam Coal Corporation,* 513 Pa. 192, 519 A.2d 385, 390 (1986).

Moreover, the contention that the second occurrence of "employees" in Article IX, Section B(1) could refer to either job-secured or non-job-secured employees does not create ambiguity. By its plain language, the provision creates an exception to the general rule that job-secured employees may not be laid off: ". . . except that in each job classification, employees may be laid off only in proportion to the projected decline in pupil enrollment. . . ." (R.R. at 68a.) Interpreting "employees" to mean only non-job-secured employees defeats the very exception this clause sets out to create.

Because Article IX, Section B(1) unambiguously permits job-secured employees to be laid off under certain circumstances, the arbitrator's consideration of past practices for purposes of clarifying the provision was improper. *See Danville Area School District v. Danville Area Education Association,* 562 Pa. 238, 754 A.2d 1255, 1260 (2000) (noting that "where there is ambiguity," an arbitrator may consider the parties' past practices as evidence of their interpretation of the terms of a CBA).[7] In any event, there was no evidence that the prior layoffs cited were the result of enrollment decline as opposed to other reasons.

Because the arbitrator's determination that the CBA does not permit job-secured teachers to be laid off and his subsequent consideration of the parties' past practices do not logically flow from the CBA, we reverse the trial court's order and remand the case to the arbitrator to determine whether the decline in student enrollment triggered Article IX, Section B(1)'s exception.[8]

### ORDER

AND NOW, this *14th* day of *July,* 2014, the order of the Court of Common Pleas of Philadelphia County dated August 19, 2013, is reversed, and this case is remanded to the arbitrator for further proceedings in accordance with the foregoing opinion.

Jurisdiction is relinquished.

**6.** *See* Chicago Manual of Style § 5.201(3) (16th ed. 2010) (noting that the word "except" is a subordinating conjunction which, when used to connect two clauses, conditions the former upon the latter).

**7.** Although we have enumerated other situations in which an arbitrator may consider evidence of past practices, the arbitrator in this case relied exclusively upon the provision's ambiguity, and the PFT has not argued that any other basis applies. *See Penns Manor Area School District v. Penns Manor Area Educational Support Personnel Association,* 953 A.2d 614, 617 (Pa.Cmwlth.2008) ("Evidence of 'past practices' is used in arbitrations in four situations: (1) to clarify ambiguous language; (2) to implement contract language which sets forth only a general rule; (3) to modify or amend apparently unambiguous language which has arguably been waived by the parties; and (4) to create or prove a separate, enforceable condition of employment which cannot be derived from the express language of the CBA."). Likewise, we find the remaining bases inapplicable.

**8.** Because we find Article IX, Section B(1) unambiguous, we do not reach the District's remaining arguments that the award infringes on the District's right to set educational policy and to manage and control its operations, and that the evidence presented was insufficient to establish a past practice.

DISSENTING OPINION BY Senior Judge FRIEDMAN.

Because I disagree with the majority's conclusion that the arbitrator's award was not rationally derived from the Collective Bargaining Agreement (CBA) between the School District of Philadelphia (District) and the Philadelphia Federation of Teachers, Local 3 (PFT), I respectfully dissent. Accordingly, I would affirm the order of the Court of Common Pleas of Philadelphia County (trial court).

Article IX of the CBA addresses "Employment Security" for all District employees. Article IX, Section B(1) of the CBA provides:

1. The parties agree that all employees who were regularly appointed to a full-time and/or part-time position during the 1979–1980 school year (i.e. September 1, 1979 to June 30, 1980) shall continue to be employed in their positions and be guaranteed full and complete job security during the term of this Agreement, except that in each job classification, [*all other*] employees may be laid off only in proportion to the projected decline in pupil enrollment as of the allotment date for each year of this Agreement, such layoff to be effective in any year only after giving notice to affected employees and to the Federation on or before June 30 of that year.

(R.R. 68a (emphasis added).)

The arbitrator determined that this provision of the CBA covers all District employees and provides employees appointed during the 1979–1980 school year with "full and complete" job security. Further, the provision subjects employees who were not appointed during the 1979–1980 school year to layoffs when enrollment declines.

The arbitrator noted the patent ambiguity in the CBA by stating that: "the language of Article IX[, Section] B, when considered in its totality, is not a model of clarity." (Arb. Award at 19.) The arbitrator determined that "pursuant to Article IX, Section B(1)[,] job secured Teachers do indeed have 'full and complete job security.' Whatever the application and use of the second part of Article IX[, Section] B(1) might be for non-job-secured Teachers, that part of Article IX[, Section] B(1) is not applicable to job secured Teachers like the Grievants." (*Id.* at 21–22.) This is a rational interpretation of the CBA.

The majority, however, interprets the CBA differently. The majority finds that Article IX, Section B(1) of the CBA "establishes a general rule of 'full and complete job security' for all employees who were regularly appointed from September 1, 1979 to June 30, 1980," and "sets forth an exception to this rule, whereby generally job-secured teachers 'may be laid off only in proportion to the projected decline in pupil enrollment....'" (Maj. Op. at 1102.)

Had the arbitrator made the findings of fact and conclusions of law that the majority believes he should have made, I would have been constrained by our deferential standard of review to affirm that decision. But the arbitrator did not interpret the CBA as the majority has. In essence, the majority believes that its interpretation is *more* rational than the arbitrator's, but that is irrelevant.

In *Danville Area School District v. Danville Area Education Association, PSEA/NEA*, 562 Pa. 238, 754 A.2d 1255, 1260 (2000) (citation omitted), the Pennsylvania Supreme Court made it abundantly clear that "an arbitrator's award may draw its essence from the [CBA] if the arbitrator's 'interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context,

and any other indicia of the parties' intention.'" A review for reasonableness is not appropriate because "it would invite a reviewing court to substitute its own interpretation of the contract language for that of the arbitrator." *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 595 Pa. 648, 939 A.2d 855, 863 (2007). That is exactly what the majority here has done: substituted its own interpretation of the CBA for the arbitrator's, failed to afford an appropriate level of deference to the arbitrator's award, and overstepped the limitations of the standard of review.

In light of the two rational interpretations of Article IX, Section B(1) of the CBA, I would find that the arbitrator's determination was derived from the essence of the CBA. *See Hutchison v. Sunbeam Coal Corporation*, 513 Pa. 192, 519 A.2d 385, 390 (1986) (noting that a contract is ambiguous if its terms are reasonably or fairly susceptible to "different constructions and capable of being understood in more than one sense"). Having determined that Article IX, Section B(1) of the CBA includes an ambiguity, the arbitrator was permitted to ascertain the parties' intent for the language of the provision by examining the parties' past practices. *See Danville*, 754 A.2d at 1260 ("[W]here there is ambiguity, an arbitrator may attempt to discern the intent of the parties, and thus, resolve a dispute over contract interpretation, by considering the actions of the parties as evidence of their interpretation of the terms of a [CBA]."). In doing so, the arbitrator concluded that all employees hired during the 1979–1980 school year that had been laid off previously were subsequently reinstated because the layoff violated the explicit guarantee of "full and complete" job security. (*See* Arb. Award at 19–20.)

For these reasons, I would affirm the trial court's order.