# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edinboro University of Pennsylvania, : 
State System of Higher Education, : 
                    Petitioner : 
                               : 
          v. :   No. 2133 C.D. 2014
                               : 
Association of Pennsylvania State :   Argued: September 17, 2015
College and University Faculties, : 
                 Respondent : 

BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge

**OPINION BY**
**JUDGE COHN JUBELIRER**           **FILED: November 13, 2015**

Edinboro University of Pennsylvania, State System of Higher Education (University), petitions for review of the November 1, 2014 arbitration award (Arbitration Award), which sustained a grievance filed by the Association of Pennsylvania State College and University Faculties (APSCUF) on behalf of University assistant professor, Barbara Miller (Miller), challenging the denial of her tenure application by the University. The Arbitration Award directed the University to retroactively grant tenure to Miller and make Miller whole for any losses. On appeal, the University argues that (1) the Arbitration Award failed to draw its essence from the Collective Bargaining Agreement (CBA) because (a) the Arbitrator usurped the University President's (President) judgment in granting tenure; (b) Miller did not have a substantive right to permanent employment; and

(c) the Arbitrator could not grant relief in the nature of specific performance; and (2) the Arbitration Award violated a well-established, defined public policy. Because we conclude that the Arbitrator exceeded her authority in granting Miller tenure, we reverse and remand.

In 2008, Miller was hired by the University as a probationary tenure-track assistant professor in the Professional Studies Department. (Arbitration Award at 1.) As a probationary tenure-track faculty member, Miller was subject to the CBA between APSCUF and the Pennsylvania State System of Higher Education (PASSHE). (Arbitration Award at 1.) Miller was also subject to a separate Local Agreement between APSCUF and the University. (Arbitration Award at 3.)

Under the CBA, a tenure-track faculty member is subject to a five-year probationary period. (CBA at Art. 15, § B, R.R. at 400a.) During the five-year probationary period, an annual performance review and evaluation is conducted with regard to the probationary faculty member's performance. (CBA at Art. 15, § B, R.R. at 400a.) The categories of performance review and evaluation are: (1) teaching and fulfillment of professional responsibilities; (2) continuing scholarly growth; and (3) service contribution to the University and/or community. (CBA at Art. 12, § B, R.R. at 389a.) The CBA does not provide specific instructions for evaluating the three categories, but states "[when] evaluating the data, the appropriate evaluator(s) shall give greater weight to the quality of the performance reflected in the data, than to the quantity of the data." (CBA at Art. 12, § B, R.R. at 389a.) The CBA lists several examples of activities that are considered "continuing scholarly growth" including:

2

development of experimental programs (including distance education); papers delivered at national and regional meetings of professional societies; regional and national awards; offices held in professional organizations; invitational lectures given; participation in panels at regional and national meetings of professional organizations; grant acquisitions; editorships of professional journals; participation in juried shows; program-related projects; quality of musical or theatrical performances; participation in one-person or invitational shows; consultantships; research projects and publication record; additional graduate work; contribution to the scholarly growth of one's peers; and any other data agreed to by the FACULTY and Administration at local meet and discuss.

(CBA at Art. 12, § B.2, R.R. at 390a.) During each of the five years of the probationary period, the Department Evaluation Committee evaluates the probationary faculty member and prepares a recommendation for the Academic Dean that either recommends or does not recommend continued employment. (CBA at Art. 12, § C.1.c, R.R. at 392a.) The Academic Dean makes a recommendation to the President, who then decides whether the probationary faculty member's contract should be renewed for the following year. (CBA at Art. 12, § C.1.c.3, R.R. at 393a; CBA at Art. 14, § A.4, R.R. at 398a.)

When the probationary faculty member begins her fifth year of service, she is provided notice of her ability to apply for tenure during the fifth year. (CBA at Art. 15, § C.1, R.R. at 400a.) If the fifth year probationary faculty member does not apply for tenure, then that probationary faculty member's sixth year of employment is her terminal year. (CBA at Art. 15, § C.2, R.R. at 400a.) The three criteria for awarding tenure are the same criteria used to annually evaluate probationary faculty members. (Arbitration Award at 21; Guidelines and Responsibilities for Faculty Applying for Tenure (Local Agreement), R.R. at 318a-19a.) In order to be awarded tenure, the probationary faculty member must

3

demonstrate success in all three criteria in her tenure application. (Arbitration Award at 21-22; Local Agreement, R.R. at 318a-19a.) In addition to those listed in the CBA, the Local Agreement lists several other criteria to consider when evaluating whether a faculty member has exhibited "continuing scholarly growth," including:

a. Graduate work completed
b. Development of new scholarly or practical insights
c. Development of new courses
d. Membership in professional organizations
e. Attendance at professional workshops, institutes or short courses
f. Evidence of active research or development of performing or artistic abilities
g. Testimony of experts in the discipline
h. Invited papers delivered, performances given, exhibits held, etc.
i. Professional consultant activities
j. Evidence of current activity which maintains or increases subject mastery.

(Local Agreement, R.R. at 319a.)

The application for tenure is initially submitted to the Department Tenure Committee (DTC) and the Department Chair (Chair), which provide recommendations on tenure. (CBA at Art. 15, § E.1, R.R. at 401a.) After the DTC and Chair make their recommendations, the application is submitted to the University Tenure Committee (UTC), which reviews the application and recommendations and provides a tenure recommendation to the President. (CBA at Art. 15, § E.2-3, R.R. at 401a.) The President reviews the application and all three recommendations, determines whether the criteria for tenure have been met, and decides whether the applicant should be awarded tenure. (CBA at Art. 15, § E.4, R.R. at 401a.)

4

If the President decides to deny tenure to the applicant, but the applicant has received at least two positive recommendations from the three recommending bodies (DTC, Chair, UTC), then the applicant has the ability to file a grievance in accordance with Article 5 of the CBA. (CBA at Art. 15, § E.4, R.R. at 401a.) Moreover, where two of the three recommending bodies provide positive recommendations, but the University denies tenure, the applicant may request that the President provide reasons, in writing, for denying tenure. (CBA at Art. 15, § E.5, R.R. at 401a.) The grievance must proceed through a three-step process before reaching an arbitrator. (CBA at Art. 5, § C, R.R. at 371a.) Under the CBA, the decision of the arbitrator is final and binding upon the parties, except where enactment of the decision would require legislation. (CBA Art. 5, § D, R.R. at 373a.) The arbitrator, however, does not have authority to add to, subtract from, or modify the CBA, and the CBA must constitute the sole basis upon which the decision is based. (CBA Art. 5, § D, R.R. at 373a.)

During Miller's five-year probationary period, she received five favorable evaluations and was unanimously recommended for retention. (Arbitration Award at 5-7, 23.) Miller applied for tenure at the beginning of her fifth year and the DTC, Chair, and UTC all recommended that she be awarded tenure. (Arbitration Award at 2, 8.) The application was then submitted to the President, who denied tenure. (Arbitration Award at 2, 8.) In denying tenure, the President wrote that "tenure is earned through the demonstration of excellence in teaching, *research*, and service" and that based on her review of Miller's application, she had decided not to grant tenure. (President Letter, May 13, 2013, R.R. at 281a (emphasis added).) The letter also informed Miller that the sixth year of her employment

5

with the University would be her last year. (President Letter, May 13, 2013, R.R. at 281a.) Thereafter, pursuant to the CBA, Miller requested that the President provide reasons for denying tenure. (Arbitration Award at 9.) The President wrote back to Miller that, "[q]uite simply, your scholarly growth is minimal and the quality of scholarship that you have produced over your first four and one half (4 ½) years as a probationary faculty member at Edinboro University…[wa]s not adequate for tenure and the privileges pertaining thereto." (President Letter, May 29, 2013, R.R. at 282a.) The President also wrote that the quantity and quality of Miller's scholarship was insufficient for someone who spent four and a half years on the tenure track and that her scholarly contributions had not progressed to a level where tenure was warranted. (President Letter, May 29, 2013, R.R. at 282a.)

Miller filed a grievance based on the tenure denial, which proceeded to arbitration. (Arbitration Award at 9.) The Arbitrator concluded that the main issue for disposition was the meaning of the term "continuing scholarly growth" in the CBA and whether the President erred in determining that Miller had not met the criterion for "continuing scholarly growth" in her tenure application. (Arbitration Award at 21-22.) It was undisputed that Miller's qualifications in the other two criteria—teaching and service contribution—were sufficient. (Arbitration Award at 3.) The Arbitrator determined that "continuing scholarly growth" is more expansive than simply just "research" and that "the CBA and the Local Agreement list a broad variety of other paths to satisfaction of that criterion." (Arbitration Award at 22.)

6

The Arbitrator determined that, during Miller's probationary years, the feedback she received in her annual evaluations signaled that she was satisfying the contractual criterion of continuing scholarly growth and that she was never informed that she was not meeting the standards for continuing scholarly growth. (Arbitration Award at 23.)   The Arbitrator found that Miller performed well in several categories that are considered continuing scholarly growth, including "achievement in the development of experimental programs (including distance education); papers delivered at national and regional meetings of professional societies; offices held in professional organizations; invitational lectures given; participation in panels at regional and national meetings of professional organizations; grant acquisitions; consultantships; and contribution to the scholarly growth of her peers." (Arbitration Award at 23.)  The Arbitrator found that the DTC, Chair, UTC, and four different deans all found that these activities constituted continuing scholarly growth and that Miller had catalogued these activities in her tenure application.  (Arbitration Award at 23.)

The Arbitrator determined that under Article 15 of the CBA she had the authority to review tenure denials.  (Arbitration Award at 24.)  The Arbitrator concluded that although "the ultimate decision is left to the [P]resident . . . it cannot be made in disregard of applicable contractual standards and past practice." (Arbitration Award at 24.)   The Arbitrator determined that "[d]uring the probationary period . . . evaluators invariably found [Miller's] progress fully satisfactory with respect to all three of the relevant contractual criteria, *including continuing scholarly growth*," and that the performance reviews informed her that she was doing what was expected of a tenure candidate.  (Arbitration Award at 26

7

(emphasis added).) The Arbitrator concluded that the President could deny "tenure only by unreasonably narrowing and/or redefining the criterion of continuing scholarly growth" to only include "research" and that, accordingly, the President violated the CBA in denying tenure. (Arbitration Award at 22, 26.)

The Arbitrator next addressed the appropriate remedy for Miller. (Arbitration Award at 26.) PASSHE asserted that the Arbitrator did not have the authority to award tenure and that the only proper remedy was to return Miller to probationary status at the University and allow her to reapply for tenure. (Arbitration Award at 26.) In contrast, APSCUF argued that the Arbitrator could award tenure. (Arbitration Award at 26.) The Arbitrator determined that, because the President had misapplied "the CBA criterion for continuing scholarly growth," the President could no longer serve as an objective decision maker. (Arbitration Award at 28.) Thus, the Arbitrator concluded that

> [n]o useful purpose would be served by returning the tenure application to the [P]resident for further consideration, since she ha[d] already rejected [Miller's] record of accomplishments as well as the uniform judgment of the various reviewing entities throughout the probationary period that [Miller's] record satisfied the contractual criterion for tenure.

(Arbitration Award at 28.)

The Arbitrator determined that, because the CBA placed no limits on arbitrators' remedial authority, arbitrators are "authorized to grant tenure when reconsideration by the [P]resident is not a practical remedy." (Arbitration Award at 28.) Therefore, the Arbitrator granted Miller tenure retroactively and directed

8

the University to make Miller whole for any losses. (Arbitration Award at 29.) The University now petitions this Court for review of the Arbitration Award.

It is well-established that, in reviewing an arbitration award, this Court applies the two-prong "essence test" analysis. State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA-NEA), 743 A.2d 405, 413 (Pa. 1999). "First, the court . . . determine[s] if the issue as properly defined is within the terms of the [CBA]. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the [CBA]." Id. Thus, this "[C]ourt will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the [CBA]." Id.

On appeal, the University does not challenge the Arbitrator's interpretation of the term "continuing scholarly growth" in the CBA or her conclusion that the President violated the terms of the CBA, but mainly challenges the actual award of tenure to Miller. The University argues that the award of tenure fails the essence test because it is not rationally derived from the CBA. An arbitrator does not have the academic expertise to evaluate the substance of a tenure application. The University contends that, because the Arbitrator engaged in a substantive review of the tenure application and determined that the President did not properly evaluate Miller's "continuing scholarly growth," the Arbitrator effectively substituted her academic judgment for that of the President.

9

The University acknowledges that an arbitrator has the authority to review a President's tenure decision and may even reinstate a probationary faculty member to the *status quo ante*. However, the University relies on Bloomsburg University of State System of Higher Education v. Association of Pennsylvania State College and University Faculties, 552 A.2d 1180 (Pa. Cmwlth. 1989), and Slippery Rock University of Pennsylvania, Pennsylvania State System of Higher Education v. Association of Pennsylvania State College and University Faculty (Pa. Cmwlth., No. 1648 C.D. 2008, filed May 12, 2009) (Slippery Rock II),[1] to argue that an arbitrator does not have the authority to actually award tenure. The University contends that this Arbitration Award is the only time in the history of the dealings between the parties that an arbitrator has unconditionally awarded tenure and granted permanent employment to a probationary faculty member. While it is the Arbitrator's prerogative to disagree with the President's decision to deny Miller tenure, the Arbitrator lacks the authority under the CBA to grant tenure. As in previous cases, here the proper remedy is to "reinstate[] Miller to her fifth year probationary status, ma[k]e her whole for any lost wages, and provide[] her the ability to reapply for tenure." (University's Br. at 30.) Accordingly, the University argues that the matter should be vacated and remanded to the Arbitrator for the entry of an award within the scope of her authority.

In contrast, APSCUF maintains that the Arbitration Award satisfies the "essence test." APSCUF contends that other arbitration awards involving the same

---

[1] Pursuant to Section 414 of this Court's Internal Operating Procedures, an unreported panel decision issued by this Court after January 15, 2008 may be cited "for its persuasive value, but not as binding precedent." 210 Pa. Code § 69.414.

CBA have awarded tenure or recognized arbitrators' authority to grant tenure. Here, because the President's conduct violated the CBA and the President's judgment was tainted, it was appropriate to grant tenure to Miller rather than allow her to resubmit her tenure application to the President. APSCUF contends that the Arbitrator's decision to grant Miller tenure was rationally derived from the CBA because the CBA places no limits on the Arbitrator's ability to fashion a remedy when the CBA is violated regarding tenure.

APSCUF also contends that the Arbitrator did not substitute her judgment for the President's in granting Miller tenure, but instead based her decision on Miller's several evaluations conducted during the probationary period, which determined that she satisfied the criterion for continuing scholarly growth. In awarding tenure, the Arbitrator did not go through Miller's tenure application and re-evaluate the submitted materials, but instead relied solely on the judgment of the other evaluators who found that Miller was worthy of tenure. The Arbitrator found that, but for the President's misapplication of the criterion for "continuing scholarly growth" in the CBA, Miller would have been granted tenure. APSCUF asserts that the CBA explicitly allows probationary faculty members to file grievances from denials of tenure when at least two of the three recommendations are in favor of tenure; therefore, to argue that only the President may grant tenure denies the contractual right bestowed upon Miller.

Upon review, we find the University's arguments persuasive. Pursuant to Article 15, Section E.4 of the CBA,

11

> [t]he President shall grant tenure effective as of the beginning of the next academic term to those FACULTY MEMBERS whom he/she approves and such decisions shall not be subject to the provisions of Article 5, GRIEVANCE PROCEDURE AND ARBITRATION. However, if at least two (2) of the three (3) recommendations (department committee, University-wide committee, department chairperson) are positive with respect to the granting of tenure and the President denies tenure, the FACULTY MEMBER shall have the right to grieve the denial of tenure in accordance with the terms of Article 5, GRIEVANCE PROCEDURE AND ARBITRATION.

(CBA at Art. 15, § E.4., R.R. at 401a.)

In Bloomsburg University, 552 A.2d at 1181-82, an arbitrator decided a grievance brought pursuant to a CBA containing the same language as Article 15. Like the instant case, in Bloomsburg University a faculty member challenged his tenure denial and the arbitrator concluded that Bloomsburg University had violated the CBA by not considering all of the relevant evidence submitted by the faculty member as part of his tenure application. Id. at 1181. Rather than grant tenure, the arbitrator remanded the matter to Bloomsburg University to reprocess the faculty member's tenure application by considering the other relevant evidence submitted with the application. Id. The award also reinstated the faculty member to fifth year probationary status in the interim. Id. On appeal, Bloomsburg University argued, *inter alia*, that the arbitrator exceeded his authority because the award effectively created an open ended tenure review process whereby the grievant would gain a sixth year of probationary status, in clear violation of the terms and conditions of the CBA. Id.

We determined that "[t]he arbitrator must be permitted a great degree of discretion in fashioning an award, consistent with the intent of the agreement, that

12

resolves the situation in a just manner." Id. at 1182. We concluded that, "[i]n light of the fact that [the arbitrator] remedied a specific violation of the agreement and *did not explore territories beyond his area of expertise, in that he expressly declined to evaluate the tenure application*, he did not exceed his authority and there is no need for this court to disturb the award." Id. (emphasis added). Thus, we upheld the arbitrator's review of a tenure denial, where the arbitrator reinstated the grievant as a probationary faculty member and allowed the grievant to reapply for tenure. Id.

Likewise, in the unreported opinion of Slippery Rock II, this Court reviewed an arbitration award involving essentially the same issues as the instant matter, i.e. whether the grievant had satisfied the criterion for "continuing scholarly growth," and whether the arbitration award failed to satisfy the essence test. Slippery Rock II, slip op. at 2, 15. In that case, the President of Slippery Rock University denied tenure after the UTC recommended denying tenure due to inadequate scholarly growth. Id., slip op. at 6-7. The arbitrator concluded that the denial of tenure was not supported by the record, violated the CBA, and, thus, ordered the grievant to "be reinstated to her status quo ante as a probationary faculty member, and that she be deemed eligible for reconsideration for tenure." Id., slip. op. at 7 (quotation omitted). After the matter was remanded to the arbitrator following a separate appeal,[2] the arbitrator determined that APSCUF met its burden of demonstrating

---

[2] Following the initial issuance of the arbitration award, Slippery Rock University appealed to this Court in Slippery Rock University of Pennsylvania, Pennsylvania State System of Higher Education v. Association of Pennsylvania State College and University Faculties, 916 A.2d 736, 743 (Pa. Cmwlth. 2007), arguing that the arbitrator applied the incorrect burden of proof in reviewing the tenure denial. We concluded that the arbitrator incorrectly placed the

*(Continued…)*

13

that the grievant met the performance review criteria for tenure, including scholarly growth, and, accordingly, awarded the same remedy as previously. Id., slip. op. at 9, 18.

On appeal, Slippery Rock University argued that the arbitration award violated public policy and did not logically flow from the CBA. Id., slip. op. at 14-15. After holding that the arbitration award did not violate public policy, we assessed whether the arbitration award was rationally derived from the CBA. Id., slip. op. at 15. The arbitrator had concluded that the UTC and the President both failed to consider many of the grievant's activities as scholarly growth, even though such activities were considered scholarly growth under the CBA. Id., slip. op. at 16-18. We determined that the arbitrator completely understood the requirements for tenure under Articles 12 and 15 of the CBA, and that the arbitrator's conclusion that the grievant satisfied the scholarly growth requirements for tenure was rationally derived from the CBA. Id., slip. op. at 16-18. We also upheld the remedy provided to the grievant by the arbitration award. Id., slip. op. at 19. While Slippery Rock II is not precedential, we find persuasive its conclusion that an arbitrator has the authority to review a President's denial of tenure to determine whether the correct criteria for tenure were applied, and that an arbitrator may allow a grievant to reapply for tenure if the incorrect criteria were applied.

burden of proof on Slippery Rock University and, thus, vacated the award and remanded the matter so that the arbitrator could place the burden of proof on APSCUF. Id.

14

More recently in <u>East Stroudsburg University of Pennsylvania, State System of Higher Education v. Association of Pennsylvania State College and University Faculties</u>, ___ A.3d ___ , ___ (Pa. Cmwlth., No. 85 C.D. 2015, filed October 19, 2015), slip op. at 5, this Court upheld an arbitrator's award ordering, *inter alia*, that the grievant be reinstated with the opportunity to re-apply for tenure. In accordance with our precedent, the arbitrator did not award tenure outright after determining that the University President did not comply with the terms of the CBA in denying tenure to the grievant. <u>Id.</u>

Accordingly, pursuant to our decisions in <u>Bloomsburg University</u>, <u>Slippery Rock II</u>, and <u>East Stroudsburg</u>, we conclude that the Arbitrator in the instant matter did not err to the extent that she reviewed the President's denial of tenure and concluded that the President did not apply the correct criterion for "continuing scholarly growth." However, here, in contrast with <u>Bloomsburg University</u>, <u>Slippery Rock II</u>, and <u>East Stroudsburg</u>, the Arbitrator did not order that Miller be reinstated and allow her to reapply for tenure, but instead granted Miller tenure outright. We conclude that the Arbitrator's actual award of tenure was not rationally derived from the CBA.

Article 15 of the CBA explicitly states that "[t]he President *shall grant tenure . . .* to those FACULTY MEMBERS *whom he/she approves*." (CBA at Art. 15, § E.4., R.R. at 401a (emphasis added).) While Article 15 allows faculty members to file grievances from tenure denials where two of the three recommendations are positive, under Article 15 the President decides whom to approve for tenure and there is nothing in the CBA that permitted the Arbitrator to

15

substitute her judgment for that of the President and grant tenure where tenure had already been denied. Although in East Stroudsburg, we also upheld the arbitrator's award mandating that someone other than the University President review the grievant's tenure application, that decision does not compel a different result in the instant matter.

The salient issue here is whether the Arbitrator had the authority to reevaluate Miller's tenure application and actually award tenure. As we have discussed, no binding precedent of this Court has held that an arbitrator has the authority to reevaluate a tenure application and actually award tenure. As we concluded in Bloomsburg University, an arbitrator does not exceed his authority so long as he does "not explore territories beyond his area of expertise" or "evaluate the tenure application." Bloomsburg University, 552 A.2d at 1182. After the Arbitrator concluded that the President applied the wrong criterion for "continuing scholarly growth" when evaluating Miller's tenure application, and that the CBA had been violated, the Arbitrator went beyond her expertise in examining Miller's annual performance evaluations and concluding that Miller had demonstrated sufficient scholarly growth to justify granting tenure. Like the cases previously discussed, after concluding that the CBA had been violated, the Arbitrator was permitted only to reinstate Miller to probationary faculty member status and allow her to reapply for tenure.

Accordingly, because we conclude that the Arbitrator exceeded her authority in granting tenure, we reverse the Arbitration Award and remand this matter to the Arbitrator to issue an award (1) reinstating Miller to probationary status; (2)

allowing Miller to reapply for tenure; and (3) instructing the President to apply the correct criterion for "continuing scholarly growth" when evaluating Miller's resubmitted tenure application.[3]

_____
**RENÉE COHN JUBELIRER, Judge**

---

[3] Because we conclude that the Arbitrator exceeded her authority in granting tenure, it is unnecessary to address the University's other arguments.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edinboro University of Pennsylvania,    :
State System of Higher Education,    :
                      Petitioner    :
    :
            v.    :   No. 2133 C.D. 2014
    :
Association of Pennsylvania State    :
College and University Faculties,    :
                  Respondent    :

## O R D E R

**NOW**, November 13, 2015, the November 1, 2014 Arbitration Award, entered in the above-captioned matter, is hereby **REVERSED** and this matter is **REMANDED** for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

_____
**RENÉE COHN JUBELIRER, Judge**

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edinboro University                              :
of Pennsylvania, State System                    :
of Higher Education,                             :
                          Petitioner             :
                                                 :
            v.                                   :
                                                 :
Association of Pennsylvania                      :
State College and University                     :
Faculties,                                       :        No. 2133 C.D. 2014
                          Respondent             :        Argued:  September 17, 2015


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE P. KEVIN BROBSON, Judge



DISSENTING OPINION BY
PRESIDENT JUDGE PELLEGRINI                        FILED: November 13, 2015


            The sole issue in this case is whether an arbitrator may award tenure
when she finds that an application for tenure was denied only because an improper
criterion was used to review it.  The majority agrees that an arbitrator had the
power to review a tenure denial by Edinboro University of Pennsylvania, State
System of Higher Education's (Edinboro) President, and does not dispute the
arbitrator's authority based upon her finding that the President did not apply the
correct criterion in concluding that Grievant did not demonstrate "continuing
scholarly growth," to direct that Grievant be reinstated as a probationary employee
and resubmit her tenure application.  However, the majority finds that the arbitrator

is without power to grant tenure, as she did here, because that decision is within the sole discretion of the President. Because that holding is directly contrary to our recent decision in *East Stroudsburg University of Pennsylvania, State System of Higher Education v. Association of Pennsylvania State College and University Faculties*, ___ A.3d ___ (Pa. Cmwlth., No. 85 C.D. 2015, filed October 19, 2015), I respectfully dissent.

Edinboro hired Barbara Miller, Ph.D. (Grievant) as an assistant professor on the tenure track in its Professional Studies Department's Educational Leadership Program effective August 16, 2008. Following 4.5 years of probationary employment and a promotion to associate professor in 2011,[1]

_____

[1] At the time Grievant was hired in 2008, Jeremy Brown served as Edinboro's President. Grievant was promoted in 2011 under the tenure of a subsequent President, James Moran. President Moran's letter promoting Grievant stated, in relevant part, "Your achievements have provided you recognition, and they have also prepared you for the increased obligations of advanced rank. I know that you will continue scholarly growth in your contributions to your profession and Edinboro University." (Reproduced Record [R.R.] at 322a.)

Similarly, the Department Chairperson, Dr. Marian S. Beckman, found evidence of Grievant's scholarly growth sufficient to support her promotion based on her doctorate and certifications, her contributions to the National Recognition Report submitted for review of the K–12 Principal and Superintendent Programs which were nationally recognized in 2007, her group deliberations which resulted in the development of the Educational Leadership doctoral program, her work in revising the Pennsylvania Department of Education (PDE)'s Principal and Superintendent Program Guidelines, her invitation to consult with the local school district, and her active memberships in organizations related to education where she held leadership positions.

The Department Promotion Committee observed Grievant's scholarly growth based on her expertise in project implementation, pre-planning, development, and implementation of funded programs, accreditation reports, PDE mandated curriculum changes, her coordination of the proposal that brought Dr. Victoria Bernhardt to campus, her "significant contributions representing the university leadership programs at the state level via PASSHE system **(Footnote continued on next page…)**

Grievant applied for tenure pursuant to the terms of the collective bargaining agreement (CBA) to which Edinboro and Grievant's collective bargaining agent, the Association of Pennsylvania State College and University Faculties (APSCUF), are parties.

Regarding the procedure for tenure, Article 15(E) of the CBA provides that the applicant's Department Tenure Committee must first provide to the University-wide Tenure Committee a list of all fifth-year, probationary faculty members who have applied for tenure and whom the Department Tenure Committee recommends for tenure. At the same time, the Department Tenure Committee Chairperson must make an independent recommendation. Next, the University Tenure Committee must submit its recommendations to the President, who "shall grant tenure effective as of the beginning of the next academic term to those FACULTY MEMBERS whom he/she approves." (R.R. at 401a.) In cases where two of the three recommendations made to the President are positive and the President denies tenure, the applicant may file a grievance in accordance with the procedure set forth in Article 5 of the CBA, providing for a three-step resolution process. If the grievance is not resolved in these steps, grievances proceed to binding arbitration as follows:

> Step Four – Binding Arbitration. If the Grievance has not been resolved at Step Three, [the Association],

---

**(continued…)**

competitions directly related to PDE reports and initiatives," use best practices, and her skill base in the area of evaluation. (*Id.* at 326a.)

but not an individual FACULTY MEMBER or group of FACULTY MEMBERS, has the sole right to refer a grievance to arbitration and to conduct the proceeding as a party, and shall within forty (40) calendar days of the receipt of the written response from Step Three submit a written notice to the Chancellor of the STATE SYSTEM or his/her designee of its intent to submit the grievance to binding arbitration. It is understood that only [the Association], or counsel for [the Association], may present the case in support of any grievance at arbitration.

\* \* \*

The decision of the arbitrator shall be final and binding upon the parties, except where the decision would require an enactment of legislation in which case the decision shall be binding only if and when such legislation is enacted. The arbitrator shall have no authority to add to, subtract from, or modify this Agreement. Each case shall be considered on its merits and this collective bargaining agreement shall constitute the sole basis upon which the decision shall be rendered…. The arbitrator shall confine himself/herself to the precise issue the parties have agreed to submit for arbitration and shall have no authority to determine any other issues not so submitted to him/her….

(*Id.* at 372a–373a.).

After Grievant submitted her application to the Department of Professional Studies Tenure Committee, its Chair, Dr. Susan H. Packard, "strongly recommend[ed]" Grievant for tenure. Likewise, Dr. Marian S. Beckman, Chairperson of the Department of Professional Studies, recommended Grievant for tenure, as did the University Tenure Committee by unanimous vote. However, Edinboro's President, Julie B. Wollman, Ph.D., ultimately denied Grievant tenure,

advising, "[q]uite simply, your scholarly growth is minimal and the quality of scholarship that you have produced over your first four and one half (4½) years as a probationary faculty member at Edinboro University of Pennsylvania is not adequate for tenure and the privileges pertaining thereto." (*Id.* at 282a.) President Wollman elucidated that her review was based on both the quality and quantity of Grievant's scholarly products, and she stated that Grievant's application "fails to demonstrate that [her] scholarly contributions have progressed during [her] probationary period to a level where, in my professional judgment, tenure is warranted." (*Id.*)

APSCUF filed a grievance contending that Edinboro violated Articles 12[2] and 15 of the CBA when it denied Grievant tenure. The matter eventually

---

[2] In addition to fulfillment of professional responsibilities, effective teaching, and contributions to the university and community, applicants for tenure must demonstrate continuing scholarly growth. Article 12(B)(2) of the CBA regarding a faculty's performance reviews and evaluations lists the following as relevant factors in considering an applicant's continuing scholarly growth:

> development of experimental programs (including distance education), papers delivered at national and regional meetings of professional societies; regional national awards; offices held in professional organizations; invitational lectures given; participation in panels at regional and national meetings of professional organizations; grant acquisitions; editorships of professional journals; participation in juried shows; program-related projects; quality of musical or theatrical performances; participation in one-person or invitational shows; consultantships; research projects and publication records; additional graduate work; contribution to the scholarly growth of one's peers; and any other data agreed to by the FACULTY and Administration at local meet and discuss [*sic*].

**(Footnote continued on next page…)**

proceeded to arbitration where the parties stipulated to the following issue: "Did [Edinboro] violate the [CBA] by denying tenure to the [G]rievant, and, if so, what shall the remedy be?" (Arbitration Award, at 1.) The pertinent inquiry before this Court is whether the arbitrator was authorized to award tenure under the CBA or whether such a decision is solely within the purview of the President.

*East Stroudsburg University of Pennsylvania, State System of Higher Education v. Association of Pennsylvania State College and University Faculties*, ___ A.3d ___ (Pa. Cmwlth., No. 85 C.D. 2015, filed October 19, 2015), a recent decision by this Court, involved identical language in the same CBA and the very issue before us now. In that case, the arbitrator ordered that a professor whose tenure application was improperly denied by a university president also purportedly based upon a lack of scholarly growth be provided the opportunity to re-apply for tenure, and that his application be reviewed by an independent official other than the university president. *Id.*, slip op. at 5. In affirming the award, we explained that "the Arbitrator created an appropriate remedy to ensure that Grievant's new tenure application would be fairly evaluated," despite the fact that the CBA did not expressly permit the arbitrator to order review by someone other than the university president. *Id.*, slip op. at 8. This holding makes clear that a university president does not have absolute and exclusive authority over decisions regarding tenure applications, which are subject to substantive review by others.

---

**(continued…)**

(R.R. at 390a.) It also provides that "[w]hen evaluating the data, the appropriate evaluator(s) shall give greater weight to the quality of the performance reflected in the data, than to the quantity of the data." (*Id.* at 389a.)

Moreover, our decision in *Bloomsburg University of Pennsylvania of the State System of Higher Education v. Association of Pennsylvania State Colleges and University Faculties*, 552 A.2d 1180 (Pa. Cmwlth. 1989), does not stand for the proposition that an arbitrator is limited to remanding a tenure application to the university for reconsideration because a university's president retains sole control over employment decisions. In *Bloomsburg*, a tenure-track professor applied for and was denied tenure by the university president after the department committee and department chair recommended that tenure be granted but the university-wide committee disagreed. *Id.* at 1181. Ultimately, the arbitrator resolved the grievance pursuant to a CBA containing the same language at issue here, ordering the professor's reinstatement to probationary status and granting him the right to reapply for tenure because the arbitrator found that the university failed to consider all of the relevant evidence submitted. *Id.* In affirming the arbitrator's award, we stated:

> We recognize that the agreement stipulates that "[t]he arbitrator shall have no authority to add to, subtract from, or modify this Agreement." Article XV, section D. We also recognize that, unless the agreement specifically addresses the decided award, any award could be construed as a modification.

> The arbitrator must be permitted a great degree of discretion in fashioning an award, consistent with the intent of the agreement, that resolves the situation in a just manner. In light of the fact that Arbitrator Jaffe remedied a specific violation of the agreement and did not explore territories beyond his area of expertise, in that he expressly declined to evaluate the tenure application, he did not exceed his authority and there is no need for this court to disturb the award.

*Id.* at 1182.  Unlike this appeal, where all of the reviewing entities recommended the grant of tenure and the President applied the wrong criterion, in *Bloomsburg*, the university-wide committee and the president failed to consider relevant evidence.  The arbitrator in that case fashioned a remedy fitting the facts as did the arbitrator here.

Because *East Stroudsburg* holds that the President does not have sole and exclusive authority to grant tenure, I would hold that the arbitrator acted within her authority in fashioning the remedy in this case.  In accordance with our long-established precedent, the arbitrator must be given the flexibility to order this remedy.  Where, as here, it is necessary to the just resolution of the grievance and thereby draws its essence from the CBA, I would not disturb the award.

DAN PELLEGRINI, President Judge