# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Municipal Authority of the City of :
McKeesport, Jonathan Cottom, Dale :
McCall, Luethel Nesbit, Mary Smitley, :
and Ryan Sturgess, :
                      Appellants :
                              :
                 v. : No. 695 C.D. 2021
                        : SUBMITTED: May 17, 2022
                        :
Utility Workers Union of America, :
AFL-CIO Local 433, Allen G. Wright, :
Vincent M. Wassel, Eric R. Toth, :
Michael Tedesco, Charles D. Swartz, :
John W. Stein Jr., Ryan S. Steele, Ryan :
J. Smith, Nickolas J. Shermenti, Paul E. :
Pollock, Jarred K. Nesbit, Tom :
Morrissey, Michael Moorefield, :
Shane R. McCall,  Adam J. Martin, :
Justin J. Kaminsky, Eric L. Hampton, :
Mark Hammerstrom, David L. Gillie, :
Louis W. Garansi, Charles G. Frederick, :
Jr., Joseph A. Ernst, Jeffrey J. Clemente, :
Patrick Chiaverini, Christopher R. :
Brancato, Anthony D. Bosnak, Jason M. :
Anderson, Ronald J. Alfer :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE LORI A. DUMAS, Judge
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## <u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                  **FILED:  June 15, 2022**

        The Municipal Authority of the City of McKeesport, Jonathan Cottom,

Dale McCall, Luethel Nesbit, Mary Smitley, and Ryan Sturgess (collectively, the

City) appeal from an order of the Court of Common Pleas of Allegheny County denying the City's petition to vacate an Act 195[1] arbitration award that sustained the grievance of the Utility Workers Union of America, AFL-CIO Local 433 (the Union). The Union filed the grievance under its previously operative collective bargaining agreement (2017 CBA) with the Authority. We affirm.

For over forty years, the Authority and the Union were parties to a CBA. The 2017 CBA was the most recent one, covering the time period of January 1, 2017 to December 31, 2017. (2017 CBA at 1-25; Reproduced Record "R.R." at 354a-79a.) Since 2015, the parties were aware that the City was attempting to sell the Authority's facility and assets. (Feb. 23, 2021 Arb. Award at 2.) Consequently, the Authority and the Union negotiated the 2017 CBA to replace the one that was expiring. (*Id*. at 7.) Ultimately, the City's asset sale to Pennsylvania American Water Company (PAWC) for 156 million dollars was finalized on December 18, 2017. Prior thereto, PAWC sent November 28, 2017 offers of employment to union employees contingent upon their acceptance of such things as passing a physical examination and a drug test. (*Id*.) Not all of them became PAWC employees, with several choosing to retire and some not joining for other reasons. (*Id*. at 8.)

On December 7, 2017, Union Steward David Denardo filed the present grievance asserting that the City remained liable under the 2017 CBA to pay "all [of the] earned [but] unpaid benefits" of thirty-one current employees. (Dec. 7, 2017 Grievance at 1; R.R. at 59a.) Neither the Authority nor the City responded to the grievance. On December 15, 2017, all union employees were advised by letter that their employment would terminate with the Authority on December 18, 2017. (Feb.

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301. Act 195, as it is commonly referred to, is the Public Employe Relations Act.

2

23, 2021 Arb. Award at 7.) On December 18, 2017, the Authority was dissolved, the union employees' employment was terminated, and the 2017 CBA between the Authority and the Union discontinued.[2] (*Id*.)

In August 2018, the Union filed an action in common pleas court raising claims for breach of contract, promissory estoppel, quantum meruit, unjust enrichment, and a writ of mandamus. Following preliminary objections, the court entered an order sending the matter to arbitration. (*Id*. at 2.) The Arbitrator held a hearing at which time he framed the issue as whether the union employees received the vacation and sick leave that they were owed at the time their employment with the Authority was terminated on December 18, 2017. In other words, whether they received the benefits for which they bargained in connection with their employment with the Authority. (Nov. 19, 2020 Hr'g, Notes of Testimony "N.T." at 11; R.R. at 187a.)

The 2017 CBA "required that sick leave and vacation benefits be earned in a year prior to the year in which they were to be taken." (Feb. 23, 2021 Arb. Award at 8.) In other words, "the benefits earned in the year worked[] were eligible to be taken the following year." (*Id*. at 16.) To that end, the parties "set January of the new year as the date to trigger the vesting or accrual of the previous year's work for vacation and sick time." (*Id*.)[3] When the December 2017 asset sale occurred,

---

[2] The Union and PAWC entered into a new CBA beginning December 18, 2017 and ending June 30, 2021. (Feb. 23, 2021 Arb. Award at 7.)

[3] The contractual provisions of the 2017 CBA pertaining to the benefits at issue provide:

**Article III, Section 2 - Vacations**

During each calendar year, regular employees shall receive vacations with pay computed on the basis of a forty (40) hour week,

**(Footnote continued on next page…)**

not including shift differentials. Employees shall receive only the amount of vacation earned during the previous calendar year.

During the first calendar year of employment, beginning with the date of employment and ending on December 31 of that year, employees shall earn five-sixths (5/6) of one (1) work days' vacation for each month of employment. Vacation so earned during the first calendar year of employment may not be taken until after the first anniversary date of employment at the Authority, and must be taken between the first anniversary day of employment and the last day of that calendar year.

From January 1 to December 31 of each calendar year, regular employees will be earning vacations for each subsequent calendar year. On every January 1, each employee shall be credited with the amount of vacation earned the previous calendar year. After the first calendar year of employment, vacations shall be earned as follows:

a. Two (2) weeks' vacation for each full calendar year employed.

b. After five (5) years of continuous employment, three (3) weeks' vacation for each full calendar year employed.

c. After ten (10) years of continuous employment, four (4) weeks' vacation for each full calendar year employed.

d. After fifteen (15) years of continuous employment, five (5) weeks' vacation.

e. After twenty (20) years of continuous employment, six (6) weeks' vacation for each full calendar year employed.

f. In determining the amount of vacation in those years in which an increase occurs, the amount from the previous year plus five-twelfths (5/12) of a day for each month worked after the employee's anniversary date rounded to the nearest whole day.

Vacations can be scheduled and taken for the week which includes New Year's Day, but no employee shall have more than two (2) consecutive weeks of vacation at any time.

Upon termination of employment, all employees shall be paid for any vacation earned during the previous calendar year of employment but not yet taken.

**(Footnote continued on next page…)**

4

All vacation days earned the previous year must be taken during the calendar year immediately following and cannot be carried over to any subsequent year.

The Authority is willing to buy back up to one (1) week of vacation from any employee wishing to do so. The request must come from the employees when submitting their vacation dates for consideration. If by granting these requests the Authority feels that it may place a burden on the budget, it may either reduce the number of days granted or deny the requests altogether. If the Authority decides to purchase vacation, employees will receive the economic benefit of that decision by the end of January.

. . . .

**Article III, Section 6 – Sickness, Accident and Life Insurance Benefits**

Each employee of the Authority shall be permitted a total of ten (10) days sick leave per year with pay and shall have the right to carryover five (5) or fewer of any of those unused sick days to a maximum accumulation of fifteen (15) unused paid sick days. If and when an employee reaches the maximum accumulated number of fifteen (15) unused sick days, and so that the employee does not lose the benefit of carryover sick days beyond the maximum number of fifteen (15), at the end of each calendar year of this Agreement the employee shall be reimbursed by the Authority for up to five (5) unused sick days beyond the accumulated maximum number of fifteen at his/her then current hourly rate.

If an employee's absence from work due to sickness or injury is for one (1) day, the employee will be paid for that day's wages without a physician's excuse. If an employee's absence from work is for two (2) or more days, the employee will be paid for those days' wages, but only upon providing a physician's excuse after returning to work.

(2017 CBA at 13-16; R.R. at 367a-70a) (emphasis added). The provision pertaining to successors provides:

**Article VII, Section 1 - Successors**

In the event of any sale . . . of the operations and maintenance of the . . . Authority during the term of this Agreement, including the whole or any portion or part thereof, which is under contract with

**(Footnote continued on next page…)**

5

approximately two weeks remained before the January 1 triggering date for payout of those benefits. Emphasizing the timing, the Arbitrator found that "in my opinion, it is no accident that [the sale occurred] two weeks prior to the January 1 date." (*Id.* at 17.) He then concluded that "a triggering event did occur on December 18, 2017, and the employees, therefore, became eligible for same as if it was in fact 13 days later on January 1 of the new year." (*Id.* at 18.) Accordingly, he sustained the grievance thereby concluding that the union employees were vested for the prior work year 2017 on December 18, 2017, and that they should be paid their earned vacation pay and sick benefits for the work year and service for 2017. (*Id.* at 19.) In March 2021, the City filed a petition to vacate the award. The trial court denied the petition and the City's appeal to this Court followed.

When reviewing arbitration awards under Act 195, this Court's role is one of deference. *State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Pro. Assoc. (PSEA/NEA)*, 743 A.2d 405, 413 (Pa. 1999). Recognizing the strong presumption that the legislature and the parties intended for an arbitrator to be the judge of disputes under a CBA, we review an arbitration award using the essence

---

Local 433, such sale . . . shall be specifically conditioned upon the purchaser . . . offering any employment opportunities . . . first to those employees in the bargaining unit represented by Local 433 who are affected by such sale . . . . Such sale . . . shall also be conditioned upon the purchaser . . . recognizing the . . . seniority of those employees accepting employment with the purchaser . . . and conditioned upon the purchaser['s] . . . prior written agreement to honor this Agreement for the remainder of its term with reference to the transferred portion of the . . . . Authority operations and maintenance. The Union shall be given at least sixty (60) days' notice that such operations are being transferred to a particular party.

(*Id.* at 23-24; R.R. at 377a-78a.)

test. *Id.* Pursuant to the essence test, "if the issue as properly defined falls within the scope of the parties' CBA, the arbitration award may only be vacated if the award 'indisputably and genuinely is without foundation in, or fails to logically flow from,' the CBA." *Neshaminy Sch. Dist. v. Neshaminy Fed'n of Teachers*, 171 A.3d 334, 337 n.3 (Pa. Cmwlth. 2017) (citation omitted). If the essence test is met, then the award can be vacated only if it satisfies the narrow public policy exception, which means that the award's enforcement would contravene a well-defined and dominant public policy. *Shamokin Area Sch. Dist. v. Am. Fed'n of State, Cnty., & Mun. Emps. Dist. Council 86*, 20 A.3d 579, 582 (Pa. Cmwlth. 2011).[4] In making these determinations, we are bound by the arbitrator's findings of fact. *Blairsville-Saltsburg Sch. Dist. v. Blairsville-Saltsburg Educ. Ass'n*, 102 A.3d 1049, 1050 (Pa. Cmwlth. 2014).

In the present case, there is no dispute that the first prong of the essence test is satisfied. The issue of whether the City (as successor to the Authority) violated the 2017 CBA by failing to pay for earned but unused leave clearly falls within the scope of the 2017 CBA. Pursuant to the second prong of the essence test, the question is whether the award determining the City's liability for those benefits and the triggering event for entitlement thereto is without foundation or fails to logically flow from the 2017 CBA. We hold that it does not.

Unquestionably, the January 1 triggering date for crediting of past earned benefits is stated in the CBA. However, this paradigm assumes the status quo of the Authority's remaining as the employer and the employee's continuation of employment in the next calendar year. Here, the asset sale disrupted that status quo. The Authority ceased to exist before January 1 and no one worked for it on

---

[4] The public policy exception is not at issue here.

7

that date. The end of the calendar year had almost been reached on December 18 when the Authority was dissolved. Thus, a literal reading of the January 1 trigger would result in depriving all employees of nearly an entire year of benefits which the CBA characterized as having been earned. Hence, the Arbitrator determined that "a triggering event must also be the sale of the Authority, the termination of employment for the employees[,] and the dissolution of the prior controlling CBA." (Feb. 23, 2021 Arb. Award at 17.) In so determining, he reasoned:

> The position that the vacation and sick benefits earned during the year but not vested or accrued until January of the next year is what the City argues. Given the current factual situation, this is form without substance. The basic concept of the vacation and sick benefits since the CBA inception has been that the benefits earned in the year worked[] were eligible to be taken the following year. This compact was broken by the sale of the assets and the closing of the Authority by the City. The benefits, vacation and sick time are then due at that time. They had been previously earned through all but the last 13 days of the year.

(*Id*. at 16.)

Moreover, the Arbitrator recognized the Authority's past practice of paying for earned but unused benefits upon retirement, quits, and discharges.[5] In support, he cited the testimony of Union Steward David Denardo and the Authority's attorney noting:

> The Authority has paid for prior work earned vacation and sick pay and such were paid for retirements,

---

[5] "[R]eliance upon past practice in the face of an ambiguous contract provision is not only permissible, but is an important tool through which an arbitrator may discover the intent of the parties." *Danville Area Sch. Dist. v. Danville Area Educ. Ass'n, PSEA/NEA*, 754 A.2d 1255, 1262 (Pa. 2000).

8

> quits, discharges, etc., although the City challenged the testimony of [Union] Stewar[d] for not having exhibits to prove this claim. But the claim and his testimony are credible and he has been in a position of authority with the [Union] for many years to know how these issues were handled. Moreover, the testimony later in the hearing that the Authority's Solicitor confirmed that when terminated, employees were paid out any back vacation and sick benefits.

(*Id.* at 16-17.) Given the fact that these separations could occur anytime in a given year, the triggering event dates obviously varied. Mr. Denardo testified that he had worked for the Authority for thirty-five years and PAWC for three years. (N.T. at 65; R.R. at 200a.) Mr. Denardo stated that when individuals in the past were terminated or retired, the Authority paid them 100% of whatever earned and accrued vacation and sick time remained unused. (N.T. at 76-77, and 91; R.R. at 203a and 207a.) The Authority's attorney confirmed that "when terminated, employees were paid out any back vacation and sick benefits."[6] (Feb. 23, 2021 Arb. Award at 16-17.)

As stated above, in rejecting the City's argument that January 1 was the triggering date, the Arbitrator noted that such application would result in a twenty-year employee receiving vacation pay for nineteen years of service but not the twenty years that he actually worked for lack of a fourteen-day total of the entire year. Noting that "it is no accident that the consummation of the sale occurred two weeks before January 1, the Arbitrator held that "[s]uch argument and claim cannot be upheld." (*Id.* at 17.) Indeed, the subterfuge provision in the 2017 CBA inserts a good faith obligation on the part of the parties not to subvert the agreement. Article I, Section 7 of the 2017 CBA provides: "The parties will not engage in subterfuge

---

[6] (N.T. at 139; R.R. at 219a.)

9

for the purpose, or with the result, of defeating or abating the provisions of this Agreement." (2017 CBA at 4; R.R. at 358a.) To that end, the timing of the sale should not preclude the City from making the union employees whole by paying them what they earned and what they are owed.

Finally, public policy supports upholding the award. As the Union observed: "[The City] will not be required to violate any even arguable lawful obligations or public duty by complying with the Arbitration Award. To the contrary, [it] [is] merely being required to pay the value of bargaining unit members' earned, but unused vacation and sick leave benefits." (Union's Br. at 20.) As the Arbitrator concluded, notwithstanding the fact that the concept of earning vacation/sick benefits may have changed in the new agreement between the Union and PAWC, "that did not abrogate the City from making employees whole for what they earned under the previous vacation/sick benefit scheme that was in the [2017] CBA with the Authority." (Feb. 23, 2021 Arb. Award at 18.)

Accordingly, we affirm.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

10

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Municipal Authority of the City of :
McKeesport, Jonathan Cottom, Dale :
McCall, Luethel Nesbit, Mary Smitley, :
and Ryan Sturgess, :
                Appellants :
                          :
          v. : No. 695 C.D. 2021
                          :
Utility Workers Union of America, :
AFL-CIO Local 433, Allen G. Wright, :
Vincent M. Wassel, Eric R. Toth, :
Michael Tedesco, Charles D. Swartz, :
John W. Stein Jr., Ryan S. Steele, Ryan :
J. Smith, Nickolas J. Shermenti, Paul E. :
Pollock, Jarred K. Nesbit, Tom :
Morrissey, Michael Moorefield, :
Shane R. McCall, Adam J. Martin, :
Justin J. Kaminsky, Eric L. Hampton, :
Mark Hammerstrom, David L. Gillie, :
Louis W. Garansi, Charles G. Frederick, :
Jr., Joseph A. Ernst, Jeffrey J. Clemente, :
Patrick Chiaverini, Christopher R. :
Brancato, Anthony D. Bosnak, Jason M. :
Anderson, Ronald J. Alfer :

# **O R D E R**


      AND NOW, this 15th day of June, 2022, the order of the Court of
Common Pleas of Allegheny County is hereby AFFIRMED.


                                  _____

                                  **BONNIE BRIGANCE LEADBETTER,**
                                  President Judge Emerita