IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Department of Corrections, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1173 C.D. 2021 |
| | : | |
| Pennsylvania State Corrections | : | |
| Officers Association, | : | |
| Respondent | : | Submitted: May 6, 2022 |

BEFORE:     HONORABLE ANNE E. COVEY, Judge
                     HONORABLE ELLEN CEISLER, Judge
                     HONORABLE LORI A. DUMAS, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
JUDGE CEISLER                                                    FILED:  July 27, 2022

The Commonwealth of Pennsylvania, Department of Corrections (DOC), petitions for review of the September 26, 2021 Arbitration Award (Award), which sustained in part a grievance filed on behalf of the Pennsylvania State Corrections Officers Association (PSCOA) and directed DOC to:  (1) add a "rover"[1] in the B Unit at the State Correctional Institution at Greene (SCI-Greene) on the 6:00 a.m. to 2:00 p.m. and 2:00 p.m. to 10:00 p.m. shifts; and (2) conduct at least three random searches in the B Unit each calendar year.  For the reasons that follow, we affirm the Award.

**Background**

PSCOA and DOC are parties to a collective bargaining agreement (CBA) covering a bargaining unit consisting of certain employees of DOC and the

---

[1] A "rover" is a corrections "officer[] that rove[s] around the [b]locks from one to another as support."  Reproduced Record (R.R.) at 15a.

Commonwealth of Pennsylvania, Department of Human Services. Corrections Officer 1 Patrick Raygor, a member of the bargaining unit, was assaulted by an inmate at SCI-Greene on January 2, 2020, while working the 2:00 p.m. to 10:00 p.m. shift. Arbitrator Christopher E. Miles (Arbitrator) described the incident as follows:

> The inmate, who remained in the [B U]nit during mealtime, attacked Officer Raygor and stabbed him multiple times in the head and face area. It was ultimately discovered that the inmate had three "home[]made" stabbing devices and two socks used as bolas: one with a lock in it and one containing batteries. The inmate admitted to using something called K-2, a synthetic version of marijuana, for several days. The record also reveals that the inmate "staged" a bottle containing urine/feces, which was thrown on Officer Raygor.

R.R. at 30a-31a. The B Unit, where the attack occurred, houses maximum custody inmates knows as "L4" inmates, and the inmate involved in the attack was an L4 inmate.[2] The Arbitrator further summarized the incident as follows:

> The assault lasted . . . a little over two . . . minutes until Sergeant [Lewis] Comer heard Officer Raygor over the radio requesting help. The

---

[2] The Arbitrator explained:

[I]nmates in Pennsylvania are generally classified on a custody level scale of [1] through [5] with L1s requiring the least level of restrictive custody and L5s requiring the maximum level. About 25 percent of the inmates housed at SCI-Greene are classified as L4s, with about 75 percent classified as L3 and L2, which indicates their levels of required restrictive custody based upon their overall demonstrated patterns of behavior.

. . . .

B[]Unit is a L4 housing unit and consists of 64 cells on each pod with a maximum capacity of 118 inmates on A-Pod and 114 inmates on B-Pod, housed within the same butterfly configuration, with a maximum inmate bed capacity of 232 inmates on the entire housing unit.

R.R. at 5a-6a.

inmate then ran around the tier and into the foyer area of [the] B[]Unit where he was initially secured by Sergeant Comer and another officer until the other responding officers intervened. Prior to the assault, Officer Raygor had no previous interactions with this particular inmate. Immediately after the assault, the responding officers took [the i]nmate . . . off the unit while another inmate actually rendered some aid to Officer Raygor.

According to the record, since [the] B[]Unit's inception over 27 years ago, an assault has never been to this extent or occurred in this manner and this unit has had no more issues than any other unit in regards to assaults or contraband. [The] Superintendent [at SCI-Greene] testified that it was truly the perfect storm in that Officer Raygor could not get a response quickly since the attention and focus of the Sergeant and the Control Booth Officer were directed on different areas of the unit.

*Id.* at 7a-8a.

The inmate who attacked Officer Raygor had been "convicted of first[-]degree murder and sentenced on January 30, 2015 to life imprisonment." *Id.* at 14a. According to testimony presented at the arbitration hearing, the inmate "engaged in the assault because his pending court appeal of his sentence was recently rejected and he was high on K[-]2 and had been 'disrespected' [earlier] by [Sergeant] Comer," who was also injured in the attack. *Id.*

Following this incident, PSCOA filed a class action grievance on behalf of Officer Raygor and other bargaining unit members. The Grievance Report averred:

> *[DOC] is violating the CBA by not showing due regard for staff safety.* On January 2, 2020 [Officer] Raygor was alone on a housing unit when he was brutally assaulted. SCI[-]Greene staffs only one officer on each pod which led to [Officer] Raygor's attack [carrying] on for over two minutes before anyone became aware.

*Id.* at 405a (emphasis added). As a remedy, PSCOA requested, *inter alia*, that its members "be made whole," that DOC be required to give due regard for officer

3

safety in compliance with the CBA, that DOC assign additional "rover" officers on all housing units at SCI-Greene on the 6:00 a.m. to 2:00 p.m. and 2:00 p.m. to 10:00 p.m. shifts, and "[a]ll other appropriate relief." *Id.* at 401a, 403a.

After unsuccessful attempts to resolve the matter through the grievance procedure set forth in the CBA, the parties submitted the matter to arbitration pursuant to Section 903 of the Pennsylvania Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. § 1101.903, and Article 35 of the CBA.[3] The Arbitrator held an evidentiary hearing on May 4, 2021, to determine whether DOC failed to give due regard to the safety of its employees in violation of Article 33, Section 22 of the CBA.[4]

---

[3] Section 903 of PERA provides, in pertinent part:

> Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory. The procedure to be adopted is a proper subject of bargaining with the proviso that the final step shall provide for a binding decision by an arbitrator or a tri-partite board of arbitrators as the parties may agree.

43 P.S. § 1101.903. Article 35 of the CBA sets forth the three-step grievance process and the parties' agreed-upon rules for arbitration. *See* R.R. at 434a-49a. The relevant CBA was in effect from July 1, 2017 through June 30, 2020.

[4] Article 33, Section 22 of the CBA provides:

> *[DOC] must retain certain prerogatives which include but are not limited to the determination of the required employee complement. Due regard shall be given by [DOC] in determining personnel needs to the safety of employees.* [PSCOA] may invoke the provisions of the grievance procedure in the event it determines that assignments are made without due regard to safety. *In the event that [PSCOA] should successfully challenge an action by [DOC] as being in violation of this Section, the Arbitrator shall be empowered to enter such award as is necessary to remedy the violation*, including the reinstatement of the status quo.

R.R. at 441a (emphasis added).

4

At the hearing, PSCOA asserted that DOC failed to give due regard to officer safety because SCI-Greene staffs only one corrections officer on each wing of each housing unit and because DOC's security technology was insufficient to protect its officers from dangerous inmates. DOC, on the other hand, asserted that it gave due regard for officer safety by determining appropriate staffing levels in the B Unit and by upgrading its security measures, including its mobile emergency phone system, its personal alarm receiver system, shoulder microphones, pull-string whistles, and security cameras. *See* R.R. at 15a-17a.

On September 26, 2021, the Arbitrator issued his Award, sustaining in part PSCOA's grievance. The Arbitrator found that DOC failed to give due regard to the safety of its employees in the B Unit at SCI-Greene, in violation of Article 33, Section 22 of the CBA. The Arbitrator concluded as follows:

> [T]he changes undertaken by [DOC] in the form of improved or upgraded technology, operational procedures, and equipment were warranted and represent improvements in the work areas for the [corrections officers]. These improvements were undertaken for the due regard of safety for the employees in accordance with Article 33, Section 22 [of the CBA]. With regard to staffing, however, there is no doubt that increased staff may not prevent all assaults, however, the record in this case reveals that for . . . [the] B Unit, all or primarily all [of] the inmates are classified as L4. [DOC] asserts that [the] B Unit is no more volatile than the other units, but testimony at the hearing indicated that [the] B Unit was a depository for the problem inmates and this is confirmed by the fact that after the assault on January 2, 2020, management found it necessary to move ten of those inmates from [the] B Unit.
>
> *. . . [I]t is my view that a "rover" on [the] B Unit for the 6:00 AM to 2:00 PM and the 2:00 PM to 10:00 PM shifts would ensure that another [corrections officer] is in the area for coverage and for better response time in the event of another assault.*

. . . .

> *. . . [F]or purposes of due regard for the employees, [DOC] is directed to conduct at least three random searches in [the] B Unit each calendar year.* Testimony revealed that one search per year is required and they try to conduct [searches] at least twice [per] year. It was agreed that contraband is always found and after a search is conducted, the inmates know that another one will not be carried out for some time. *Additional searches may be the single most effective way to ensure the safety of the employees.* In this case, had another search been done prior to the incident, the multiple weapons possessed by the inmate who assaulted Officer Raygor may have been discovered in addition to the K-2 drug that he admitted using for several days. *All of this is directed in the exercise of sufficient, appropriate, and careful thought for the safety of the bargaining unit employees in the B Unit at SCI-Greene.*

*Id.* at 32a-33a (emphasis added).

On October 26, 2021, DOC filed a Petition for Review of the Award with this Court. DOC also requested that the Arbitrator stay his award pending disposition of its Petition for Review, which he denied. On December 1, 2021, DOC filed an Application for Supersedeas with this Court, which this Court denied on January 7, 2022, after oral argument.

**Analysis**

On appeal, DOC asserts that the Arbitrator's Award is not rationally derived from the parties' CBA. Specifically, DOC contends that the Arbitrator exceeded his authority under the CBA by infringing on the right of DOC's management to direct its operations and workforce and by not confining his Award to the precise issue submitted for arbitration.

This Court applies the highly deferential "essence test" when reviewing a grievance arbitration award issued under PERA. *Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 996 (Pa. 2019). Under the essence test, we must uphold an arbitration award if the issue, as properly defined,

6

is within the terms of the CBA[5] and the arbitrator's interpretation can be rationally derived from the CBA. *State Sys. of Higher Educ. (Cheyney Univ.) v. State College & Univ. Prof'l Ass'n (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999). Thus, this "[C]ourt will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in or fails to logically flow from, the [CBA]." *Id.* In other words, the question is "not whether th[is] Court agrees with the [a]rbitrator's interpretation of the CBA[,] but whether the [a]rbitrator's interpretation and application of the [CBA] can be reconciled with the language of the [CBA]." *Dep't of Corr. v. Pa. State Corr. Officers Ass'n*, 38 A.3d 975, 980 (Pa. Cmwlth. 2011).

First, DOC asserts that the Award violates the CBA because it orders DOC to add an additional officer as a "rover" in the B Unit and to conduct a minimum number of random searches, thereby infringing upon DOC's organizational structure and the direction of its operations and workforce. In support of its position, DOC relies on Article 2, Section 1 of the CBA, which provides:

> It is understood and agreed that *[DOC], at its sound discretion, possesses the right, in accordance with applicable laws, to manage all operations including the direction of the working force and the right to plan, direct, and control the operation of all equipment and other property of [DOC], except as modified by this [CBA].*
>
> *Matters of inherent managerial policy are reserved exclusively to [DOC].* These include but shall not be limited to such areas of discretion or policy as *the functions and programs of [DOC], standards of service, its[] overall budget, utilization of technology, the organizational structure and selection and direction of personnel.*

R.R. at 97a (emphasis added). DOC also relies on Article 33, Section 22 of the CBA, which provides that DOC "must retain certain prerogatives which include but are

[5] The parties do not dispute that the issue before the Arbitrator was within the terms of the CBA.

7

not limited to *the determination of the required employee complement*." *Id.* at 125a (emphasis added).

These CBA provisions, however, when read together and in their entirety, demonstrate that DOC's managerial rights are not unfettered. While Article 2, Section 1 recognizes DOC's right to direct its operations and workforce, that provision expressly states that such right is limited *where modified by the CBA*. Article 2, Section 1 provides that DOC "possesses the right, in accordance with applicable laws, to manage *all operations* including the direction of the working force . . . , *except as modified by this [CBA]*." R.R. at 97a (emphasis added). Article 33, Section 22 of the CBA, in turn, provides such a modification. Article 33, Section 22 restricts DOC's authority to "determin[e] . . . the required employee complement" by requiring DOC to give "[d]ue regard . . . in determining personnel needs to the safety of employees" and by "empower[ing]" the arbitrator "to enter such award as is necessary to remedy [a] violation." *Id.* at 125a. In other words, Article 33, Section 22 limits the managerial rights outlined in Article 2, Section 1 by requiring DOC to give "due regard" for officer safety in directing its workforce and by giving the arbitrator broad authority to remedy a violation if he determines that DOC failed to give "due regard" for officer safety.

Here, with regard to officer safety, the Arbitrator determined:

[T]he use of only 4 [corrections officers] on a [b]lock on the 6:00 AM to 2:00 PM and 2:00 PM to 10:00 PM shifts[] results in one [corrections officer] on a [w]ing of a housing [b]lock during inmate movements, and clearly does not evidence sufficient, appropriate and careful thought and attention to the safety of the [corrections officers], especially when the Sergeant [on duty] can provide relief for one of the officers when on a break, which lowers the complement to 3 officers on the [b]lock/shift.

8

. . . .

> The witnesses testified that the [B Unit] has been staffed with 4 officers since [SCI-Greene] opened [27 years ago]. They confirmed that there have been prior incidents of inmate-on-inmate assaults, and some inmate-on-officer assaults. *The current incident with Officer Raygor was the worst the institution has incurred, the "perfect storm." Yet . . . DOC saw no need to alter its staffing, preferring to "enhance" the methods that already failed.* PSCOA witnesses testified that the [B Unit] became a "dumping ground" for problem inmates/bad actors, which creates problems concerning care, custody, and control of the inmates there. Further, *DOC witnesses testified to the ample presence of contraband, including weaponry and mind-altering drugs, in the inmate population.* DOC witnesses confirm that this assault permitted them to investigate and remove 10 to 12 "problem" inmates from the [B Unit] that is considered to house "problem inmates," showing how much of a problem they have been beyond the norm.

R.R. at 12a, 14a (emphasis added). The Arbitrator further noted that, prior to Officer Raygor's assault, there were no "rover" officers assigned to the B Unit, except for one Sergeant who moved between the units while on duty. *Id.* at 15a, 18a. The Arbitrator found that, despite DOC's contention that the B "[U]nit has had no more issues than any other unit in regard[] to assaults or contraband," the evidence showed that "the B Unit was a depository for problem inmates" and that "contraband [was] always found after a [random] search [was] conducted." *Id.* at 33a.

The Arbitrator also considered DOC's evidence regarding its recently implemented security enhancements at SCI-Greene,[6] but he ultimately concluded

---

[6] Several security upgrades had been planned, but not yet implemented, at the time of Officer Raygor's assault. The Arbitrator noted:

> Since the assault in question, major upgrades to the control panels on the housing units as well as upgrades and improvements for the equipment [used] by the officers have been made. According to [DOC], the upgrades had been planned prior to the incident but, at the time of the hearing, all upgrades ha[d] been completed.

**(Footnote continued on next page…)**

9

that those enhancements were insufficient to prevent the type of attack that occurred in this case, primarily due to inadequate staffing in the B Unit. Specifically, the Arbitrator determined:

> Cameras and radios do provide aid to the officers, but the technology did not stop the assault, nor did the other officers see what happened or respond for over 3 minutes. There is no indication that if these "enhancements" had occurred on January 2, 2020, . . . the assault still would not have occurred without adequate response. *Hence, the "enhancements" do not actually provide the needed enhanced protection/safety measures required. The technology is a helpful tool, but it is no substitute for manpower (i.e. another officer there to provide backup). As the witnesses confirmed, even the presence of the other officer creates a deterrent effect that is missing when a single officer attempts care, custody, and control.*

*Id.* at 18a-19a (emphasis added).

Based on the credible evidence of record, the Arbitrator concluded that DOC gave due regard to the safety of its corrections officers by undertaking recent improvements to the security technology, operational procedures, and equipment at SCI-Greene. However, the Arbitrator ultimately concluded that DOC failed to give due regard to officer safety with regard to staffing and contraband searches in the B Unit. To remedy that violation, the Arbitrator directed DOC to add a "rover" to the B Unit on the 6 a.m. to 2 p.m. and 2 p.m. to 10 p.m. shifts, when the inmates are most active, to "ensure that another [corrections officer] is in the area for coverage and for better response time in the event of another assault." *Id.* at 33a. The Arbitrator further directed that DOC conduct at least three random contraband

---

R.R. at 31a. The Arbitrator also noted that, at the time of the hearing, DOC had recently implemented several "operational and procedural changes" at SCI-Greene. For example, DOC "eliminated meal[]time movements entirely," as "inmates [now] eat their three meals a day within their cells." *Id.* at 32a. DOC also modified yard movements, as "the "yard officers now come on the unit to help escort and secure inmates back to their units and into their cells." *Id.*

10

searches in the B Unit per calendar year, finding that "[a]dditional searches may be the single most effective way to ensure the safety of [DOC's] employees." *Id.*

The Arbitrator exercised his authority under Article 33, Section 22 of the CBA to fashion a remedy that he believed would best ensure the safety of the corrections officers in the B Unit going forward. In light of the deference we must give the Arbitrator's Award under the essence test, we cannot conclude that the Award in this case "indisputably and genuinely is without foundation in, or fails to logically flow from, the [parties'] CBA." *Cheyney Univ.*, 743 A.2d at 413.

We also reject DOC's assertion that the portion of the Award directing DOC to conduct a minimum number of searches in the B Unit violates Article 35, Section 2 of the CBA, which states that "[t]he arbitrator shall be *confined to the precise issue submitted for arbitration* and shall have *no authority to determine any other issues not submitted*." R.R. at 426a (emphasis added); *see also Dep't of Corr. v. Pa. Corr. Officers Ass'n*, 920 A.2d 898, 901 (Pa. Cmwlth. 2007) ("While an arbitrator is given latitude and flexibility in fashioning a proper remedy, that latitude and flexibility does not stretch to allow an arbitrator to resolve matters not before him.") (internal citation omitted). DOC contends that the grievance at issue was limited only to staffing in the B Unit and, therefore, the Arbitrator exceeded his authority when he directed DOC's employees to conduct a specific number of contraband searches per year. We disagree.

The issue before the Arbitrator was "whether [DOC] at SCI-Greene, and more specifically on the B Unit at the facility, failed to give due regard to the *safety of its employees in violation of Article 33, Section 22 of the [CBA]*." R.R. at 30a (emphasis added); *see also id.* at 405a (the Grievance report stated that "[DOC] is *violating the CBA by not showing due regard for staff safety*") (emphasis added). Contrary to

11

DOC's contention on appeal, the issue before the Arbitrator was not limited only to staffing, because Article 33, Section 22 of the CBA, which addresses "due regard" for employee safety in personnel decisions, expressly authorized the Arbitrator "to enter such [an] award *as [was] necessary to remedy the violation*." *Id.* at 125a (emphasis added); *see id.* at 401a, 403a (PSCOA, in addition to requesting more "rovers," also requested *"[a]ll other appropriate relief"* to remedy DOC's violation) (emphasis added). Although much of the evidence at the hearing related to staffing in the B Unit, there was also testimony regarding the quantity of contraband weapons and drugs possessed by inmates in the B Unit, some of which were used in the attack of Officer Raygor. *See, e.g.*, *id.* at 20a (stating that "subsequent cell searches revealed numerous homemade weapons and drugs in the possession of the inmates on the [B Unit]").

Here, the Arbitrator determined, based on the credible evidence of record, that an increase in both staffing *and* random contraband searches was necessary to remedy the unsafe conditions for corrections officers in the B Unit, as evidenced by an inmate's attack on Officer Raygor. At the time of the attack, the inmate was under the influence of a synthetic drug and used homemade weapons to repeatedly stab Officer Raygor. The Arbitrator explained his reasoning as follows:

> [T]here is no doubt that increased staff may not prevent all assaults, however, the record in this case reveals that *for . . . [the] B Unit, all or primarily all [of] the inmates are classified as L4. [DOC] asserts that [the] B Unit is no more volatile than the other units, but testimony at the hearing indicated that [the] B Unit was a depository for the problem inmates* and this is confirmed by the fact that after the assault on January 2, 2020, management found it necessary to move ten of those inmates from [the] B Unit.
>
> . . . [I]t is my view that a "rover" on [the] B Unit for the 6:00 AM to 2:00 PM and the 2:00 PM to 10:00 PM shifts would ensure that

12

another [corrections officer] is in the area for coverage and for better response time in the event of another assault.

*Id.* at 33a (emphasis added). With regard to contraband searches, the Arbitrator determined:

> Testimony revealed that one search per year is required and [the corrections officers] try to conduct [searches] at least twice [per] year. *It was agreed that contraband is always found and after a search is conducted, the inmates know that another one will not be carried out for some time. Additional searches may be the single most effective way to ensure the safety of the employees.* In this case, *had another search been done prior to the incident, the multiple weapons possessed by the inmate who assaulted Officer Raygor may have been discovered in addition to the K-2 drug that he admitted using for several days. All of this is directed in the exercise of sufficient, appropriate, and careful thought for the safety of the bargaining unit employees in the B Unit at SCI-Greene*.

*Id.* (emphasis added); *see also id.* at 125a (authorizing the Arbitrator "to enter such [an] award as is necessary to remedy [a] violation" of the "due regard" provision). We conclude that the portion of the Award directing DOC to conduct additional contraband searches in the B Unit was within the precise issue before the Arbitrator – namely, whether DOC failed to give due regard for officer safety in the direction of its workforce.

Furthermore, despite PSCOA's request that the Arbitrator mandate additional safety measures for *all* housing units at SCI-Greene to protect the officers' safety, *see* R.R. at 401a, 403a, the Arbitrator specifically limited his remedy to *the B Unit*, where Officer Raygor was brutally assaulted. *See* R.R. at 3a, 34a. The Award did not extend to any other housing unit at SCI-Greene. We conclude that the Award was narrowly tailored to remedy the proven safety violation and, therefore, did not violate the parties' CBA.

13

## **Conclusion**

Accordingly, because we conclude that the Arbitrator's Award was rationally derived from, and drew its essence from, the parties' CBA, we affirm the Award.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Corrections,          :
                    Petitioner     :
                                   :
        v.                         :  No. 1173 C.D. 2021
                                   :
Pennsylvania State Corrections     :
Officers Association,              :
                    Respondent     :

# **O R D E R**

AND NOW, this 27th day of July, 2022, we hereby AFFIRM the Arbitration Award, entered on September 26, 2021, sustaining in part the grievance filed by the Pennsylvania State Corrections Officers Association.

                                   _____
                                   ELLEN CEISLER, Judge